ACCEPTED
01-14-00826-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
12/30/2014 11:11:32 PM
CHRISTOPHER PRINE
CLERK

No.  01-14-00826-CV

# In the Court of Appeals
# for the First Judicial District
# Houston, Texas

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
12/30/2014 11:11:32 PM
CHRISTOPHER A. PRINE
Clerk

---

## IN THE INTEREST OF J. M. A MINOR CHILD

---

On Appeal from Cause No. CCL7443 in the
County Court at Law of Washington County, Texas

---

## BRIEF OF APPELLEE

---

TREVOR A. WOODRUFF
TDFPS Interim General Counsel

MARK T. ZUNIGA
Appellate Attorney
Office of General Counsel
State Bar No.  24013804
2401 Ridgepoint, Bldg. H-2
MC: Y-956
Austin, Texas  78754
Tel.:  (512) 929-6617
Fax:  (512) 339-5876
mark.zuniga@dfps.state.tx.us

JOHNNIE BETH PAGE
TDFPS Director of Program Litigation

ATTORNEYS FOR APPELLEE, THE TEXAS
DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES

## IDENTITY OF PARTIES AND COUNSEL

In accordance with Texas Rule of Appellate Procedure 38.2(a)(1)(A), the Department adopts the Identity of Parties and Counsel set out in KIMBERLY'S BRIEF.

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL ...........................................................i

TABLE OF CONTENTS ................................................................ ii

INDEX OF AUTHORITIES.............................................................iv

STATEMENT OF THE CASE ..................................................... viii

ISSUES PRESENTED ....................................................................ix

> **RESPONSE TO KIMBERLY'S ISSUE TWO:** The evidence established that Kimberly has a five year history of methamphetamine abuse. After drug treatment in this case, she failed to complete aftercare and relapsed. She did not complete a second drug treatment program until 47 days prior to trial. She did not participate in individual therapy to address domestic violence, and in the last few months of the case saw the man who put a gun to her head more often than the child. She failed to maintain stable housing before and throughout the pendency of the case. The Department's plan is to have the maternal grandmother adopt. Is the evidence legally sufficient to support the finding that termination of Kimberly's parental rights was in the child's best interest under Family Code subsection 161.001(2)? ...................................................ix

> **RESPONSE TO KIMBERLY'S ISSUE ONE:** After a removal hearing before which the Department did not have custody of the child, the trial court, without the benefit of an affidavit of indigence, appointed an attorney once Kimberly appeared in opposition to the suit. Did the trial court err in not appointing an attorney for Kimberly until 7 months prior to trial?...........................................ix

STATEMENT OF FACTS.................................................................2

SUMMARY OF THE ARGUMENT.................................................21

STANDARD OF REVIEW...............................................................23

    A. Clear and Convincing Burden of Proof ..........................................23

    B. Standard in Conducting Legal and Factual Sufficiency Review ..................24

    C. Trier of Fact Has the Authority to Resolve Credibility Issues and Conflicts in the Evidence ...................................................25

ARGUMENT ...............................................................................26

**RESPONSE TO KIMBERLY'S ISSUE TWO:** The evidence established that Kimberly has a five year history of methamphetamine abuse. After drug treatment in this case, she failed to complete aftercare and relapsed. She did not complete a second drug treatment program until 47 days prior to trial. She did not participate in individual therapy to address domestic violence, and in the last few months of the case saw the man who put a gun to her head more often than the child. She failed to maintain stable housing before and throughout the pendency of the case. The Department's plan is to have the maternal grandmother adopt. Is the evidence legally sufficient to support the finding that termination of Kimberly's parental rights was in the child's best interest under Family Code subsection 161.001(2)? ............................................................26

A. The *Holley* Factors .....................................................................................27

B. Evidence Relevant to Best Interest Determination ......................................29

C. Conclusion...................................................................................................49

**RESPONSE TO KIMBERLY'S ISSUE ONE:** After a removal hearing before which the Department did not have custody of the child, the trial court, without the benefit of an affidavit of indigence, appointed an attorney once Kimberly appeared in opposition to the suit. Did the trial court err in not appointing an attorney for Kimberly until 7 months prior to trial?............................................49

A. Kimberly Appointed Counsel at Appropriate Time ....................................50

B. TEX. FAM. CODE § 262.201 .........................................................................52

C. TEX. FAM. CODE § 262.205 .........................................................................54

PRAYER .................................................................................................................56

CERTIFICATE OF COMPLIANCE OF TYPEFACE AND WORD COUNT ..............................57

CERTIFICATE OF SERVICE .......................................................................................58

**Cases:**                                                                                   **Page**

*In re A.B.*,
  No. 04-13-00246-CV, 2013 Tex. App. LEXIS 10841 (Tex. App.–San Antonio,
  August 28, 2013, no pet.) (mem. op.)........................................................34, 38

*In re A.M*,
  385 S.W.3d 74 (Tex. App. – Waco 2012, pet denied)........................................32

*In re B.G.*,
  317 S.W.3d 250 (Tex. 2010) ................................................................50

*In re B.R.*,
  950 S.W.2d 113 (Tex. App.—El Paso 1997, no writ)........................................25

*In re B.S.W.*,
  No. 14-04-00496-CV, 2004 Tex. App. LEXIS 11695, 2004 WL 2964015 (Tex.
  App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.)...........37, 44, 48

*In re C.A.J.*,
  122 S.W.3d 888 (Tex. App.–Fort Worth 2003, no pet.)........................38, 44, 48

*In re C.C.*,
  No. 13-07-00541-CV, 2009 Tex. App. LEXIS 2239 (Tex. App.—Corpus
  Christi Apr. 2, 2009, pet. denied) (mem. op.)....................................................28

*In re C.H.*,
  89 S.W.3d 17 (Tex. 2002)..............................................................23, 25, 27, 28

*In re C.N.C.*,
  No. 13-12-00164, 2012 Tex. App. LEXIS 7431 (Tex. App.—Corpus Christi
  Aug. 27, 2012, no pet.) (mem. op.).....................................................................39

*In re D.M.*,
  58 S.W.3d 801 (Tex. App.—Fort Worth 2001, no pet.)....................................28

*D.O. v. Tex. Dep't of Human Servs.*,
  851 S.W.2d 351 (Tex. App.—Austin 1993, no writ) .......................33, 39, 41, 44

*In re D.S.*,
  333 S.W.3d 379 (Tex. App.—Amarillo 2011, no pet.) ..............................33, 38

*Davis v. Travis County Child Welfare Unit*,
    564 S.W.2d 415 (Tex. Civ. App.—Austin 1978, no writ) .................................32

*Dupree v. Tex. Dep't. of Protective & Regulatory Servs.*,
    907 S.W.2d 81 (Tex. App.—Dallas 1995, no writ)...............................27, 31, 36

*In re E.A.*,
    No. 13-06-503-CV, 2007 Tex. App. LEXIS 7159 (Tex. App.—Corpus Christi
    Aug. 31, 2007, no pet.) (mem. op.).....................................32, 33, 37, 38

*In re E.C.R.*,
    402 S.W.3d 239 (Tex. 2013) .............................................................33

*In re E.S.M.*,
    550 S.W.2d 749 (Tex. Civ. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.).25

*In re F.A.R.*,
    No. 11-04-00014-CV, 2005 Tex. App. LEXIS 234 (Tex. App.—Eastland Jan.
    13, 2005, no pet.) (mem. op.) ...................................................32, 36

*In re G.M.*,
    596 S.W.2d 846 (Tex. 1980) .............................................................23

*In re G.S.*,
    No 14-14-00477-CV, 2014 Tex. App. LEXIS 10563 (Tex. App.–Houston [14th
    Dist.], September 23, 2014, no pet.) (mem. op.) ................................31

*Holley v. Adams*,
    544 S.W.2d 367 (Tex. 1976) .............................................................27

*In re J.D.*,
    436 S.W.3d 105 (Tex. App.—Houston [14th Dist.] 2014, no pet.) .............29, 31

*In re J.F.C.*,
    96 S.W.3d 256 (Tex. 2002)............................................................24, 26

*In re J.N.H.*,
    No. 02-11-00075-CV, 2011 WL 5607614, 2011 Tex. App. LEXIS 9199 (Tex.
    App.—Fort Worth, Nov. 17, 2011, no pet.) (mem. op.).....................................31

*In re J.O.C.*,
    47 S.W.3d 108 (Tex. App.—Waco 2001, no pet.) ...........................................27

*In re K.C.*,
    219 S.W.3d 924 (Tex. App.—Dallas 2007, no pet.) .......................................31

*In re K.L.L.H.*,
No. 06-09-00067-CV, 2010 Tex. App. LEXIS 154, 2010 WL 87043 (Tex. App.—Texarkana Jan. 12, 2010, pet. denied) (mem. op.)............................50, 52

*In re K.M.L.*,
443 S.W.3d 101 (Tex. 2014) ...................................................................................50

*In re L.M.I.*,
119 S.W.3d 707 (Tex. 2003) ..................................................................................26

*In re M.R.*,
243 S.W.3d 807 (Tex. App.—Fort Worth 2007, no pet.).............................31, 38

*Maritime Overseas Corp. v. Ellis*,
971 S.W.2d 402 (Tex. 1998), cert. denied, 525 U.S. 1017 (1998).....................25

*May v. May*,
829 S.W.2d 373 (Tex. App.—Corpus Christi 1992, writ denied)...............33, 38,

*In re O.N.H.*,
401 S.W.3d 681 (Tex. App.—San Antonio 2013, no pet.) ..........................34, 38

*In re R.D.S.*,
902 S.W.2d 714 (Tex. App.—Amarillo 1995, no writ) ......................................25

*Ray v. Burns*,
832 S.W.2d 431 (Tex. App.—Waco 1992, no writ)....................................33, 38

*In re S.H.A.*,
728 S.W.2d 73 (Tex. App.—1987 writ ref'd n.r.e.).........................................28

*In re S.P.M.*,
No. 07-13-00282-CV, 2014 Tex. App. LEXIS 614 (Tex. App.—Amarillo Jan. 21, 2014, no pet.) (mem. op.) ...................................................................41, 44

*In re T.D.C.*,
91 S.W.3d 865 (Tex. App.—Fort Worth 2002, pet. denied).............................44

*Toliver v. Tex. Dep't of Family and Protective Servs.*,
217 S.W.3d 85 (Tex. App.—Houston [1st Dist.] 2006, no pet.)..................32, 37

*Transp. Ins. Co. v. Moriel*,
879 S.W.2d 10 (Tex. 1994)...................................................................................23

*In re V.A.*,
No. 13-06-237-CV, 2007 Tex. App. LEXIS 805 (Tex. App.—Corpus Christi Feb. 1, 2007, no pet.) (mem. op) ...............................................................33, 38

*In re V.L.B.*,
445 S.W.3d 802, No. 01-14-00201-CV, 2014 Tex. App. LEXIS 10043 (Tex. App.–Houston [1st Dist.] September 4, 2014, no pet.) (op. on reh'g) ..........51, 52

*In re W.E.C.*,
110 S.W.3d 231 (Tex. App.—Fort Worth 2003, no pet.)..............................39, 41

*Wilson v. State*,
116 S.W.3d 923 (Tex. App.—Dallas 2003, no pet.) ....................................39, 41

*Wischer v. Tex. Dep't of Family and Protective Servs.*,
No. 03-12-00165-CV, 2012 Tex. App. LEXIS 7523 (Tex. App.—Austin Aug. 29, 2012, no pet.) (mem. op.) ................................................................................39

*In re Z.S.*,
___S.W.3d ___, No. 05-13-01614-CV, 2014 Tex. App. LEXIS 2958 (Tex. App.–Dallas, March 17, 2014, no pet.)............................................................28


**Statutes:**

TEX. FAM. CODE § 101.007 (Lexis 2014)................................................................23

TEX. FAM. CODE § 107.013 (Lexis 2014)..........................................................50, 52

TEX. FAM. CODE § 161.001 (Lexis 2014)....................................................... *passim*

TEX. FAM. CODE § 262.102 (Lexis 2014)................................................................56

TEX. FAM. CODE § 262.201 (Lexis 2014).......................................52, 53, 54 , 55, 56

TEX. FAM. CODE § 262.205 (Lexis 2014).....................................................54, 55, 56


**Rules:**

TEX. R. APP. P. 9.8............................................................................................1

# STATEMENT OF THE CASE

*Nature of the Case*:

Involuntary termination of parental rights under chapter 161 of the Texas Family Code.

*Trial Court*:

The Honorable Matthew Reue, Judge Presiding in the County Court at Law of Washington County, Texas.

*Disposition in the Trial Court*:

After a jury trial, the trial court found by clear and convincing evidence that termination of the parent-child relationship of Kimberly to the child is in the child's best interest and that Kimberly engaged in acts or conduct that satisfied one or more of the statutory grounds for termination. The Department was appointed permanent managing conservator of the child.

*Parties in the Court of Appeals*:

Kimberly, Appellant.

Texas Department of Family and Protective Services, Appellee.

# ISSUES PRESENTED

**RESPONSE TO KIMBERLY'S ISSUE TWO:** The evidence established that Kimberly has a five year history of methamphetamine abuse. After drug treatment in this case, she failed to complete aftercare and relapsed. She did not complete a second drug treatment program until 47 days prior to trial. She did not participate in individual therapy to address domestic violence, and in the last few months of the case saw the man who put a gun to her head more often than the child. She failed to maintain stable housing before and throughout the pendency of the case. The Department's plan is to have the maternal grandmother adopt. Is the evidence legally sufficient to support the finding that termination of Kimberly's parental rights was in the child's best interest under Family Code subsection 161.001(2)?

**RESPONSE TO KIMBERLY'S ISSUE ONE:** After a removal hearing before which the Department did not have custody of the child, the trial court, without the benefit of an affidavit of indigence, appointed an attorney once Kimberly appeared in opposition to the suit. Did the trial court err in not appointing an attorney for Kimberly until 7 months prior to trial?

No. 01-14-00826-CV

# In the Court of Appeals
# for the First Judicial District
# Houston, Texas

---

## IN THE INTEREST OF J.M., A CHILD

---

**On Appeal from Cause No. CCL-7433 in the
County Court at Law of Washington County, Texas**

---

## BRIEF OF APPELLEE

---

To the Honorable Justices of the Court of Appeals:

This case involves the termination of parental rights of "Kimberly" to the child "Jennifer."[1]  CR 1:186-196, 2:2; APPENDIX 1, 2.  After a jury verdict, the Honorable Judge Matthew Reue signed an *Order of Termination* on October 2, 2014.  CR 1:186-196; APPENDIX 1.  The Honorable Judge Matthew Reue also signed a *Judgment Nunc Pro Tunc* on November 6, 2014.  CR 2:2; RR 13:4; APPENDIX 2.  These orders, collectively, terminated Kimberly's parental rights to Jennifer under Family Code subsections 161.001(1)(D), (E), (O) and (P) and found

---

[1] The Department shall use pseudonyms to refer to family members.  *See* TEX. R. APP. P. 9.8.  It will refer to the appellant mother as "Kimberly", the father as "David", and the child as "Jennifer".  The maternal grandmother shall be referred to as "Theresa" and her husband as "Bob".

that termination is in the child's best interest.[2]  CR 1:186-196, 2:2; APPENDIX 1, 2; TEX. FAM. CODE § 161.001 (Lexis 2014); APPENDIX 3.  The order also appointed the Texas Department of Family and Protective Services (the "Department") as the child's permanent managing conservator.  CR 1:189; APPENDIX 1.

In two issues, Kimberly challenges the legal sufficiency of the jury's finding that termination was in the best interest of the child, and complains about the process in which she was appointed counsel.  Specifically, she complains about the failure of the trial court to admonish her about the right to a court-appointed attorney at the initial hearing and the alleged failure to timely appoint that attorney. KIMBERLY'S BRIEF iv.

After a review of the record, Kimberly's issues should be denied.

## STATEMENT OF FACTS

### *Background information*

David, age 31, and Kimberly, age 25, are the parents of Jennifer, who was 19 months old at the time of trial.  CR 1:2; RR 8:1, 148, 161-62.

### *Kimberly's drug use and lack of stability prior to removal*

Kimberly admitted that she began crushing her prescribed Adderall pills and snorting them when she was 15, just before being sent to a boarding school.  RR 8:150.  She tried cocaine at about the same time.  RR 8:190.

---

[2] In the same order, the trial court also terminated David's parental rights.  CR 1:186-196.  David does not appeal this judgment.

Kimberly testified that she decided to leave the home of her mother, Theresa, when she was 17. RR 8:151-52. Kimberly claimed she would not call it running away because, she claimed, her mother knew where she was. RR 8:151-52. Theresa, on the other hand, indicated her daughter did run away and testified that she was not always able to find Kimberly or maintain contact. RR 9:121.

Kimberly testified that she then moved in with a friend, "L.M.", who used to run a bible study. RR 8:152. She moved out "[n]ot long" after moving in because their boyfriends did not get along. RR 8:152. Kimberly claimed she does not remember where she lived after that. RR 8:152.

At some point she reached an agreement with Theresa to move back home. RR 8:153. She testified that she thought her parents were too controlling, so she moved out again. RR 9:153.

She then moved in with her boyfriend, "N.N.", in Brenham for a few months. RR 8:154. She left him when "he was getting on [her] nerves" and moved in with her friend, "E.B.", in Brenham. RR 8:155.

Kimberly testified that she stayed with E.B. for almost six months before she moved in with her boyfriend, "C.L.", first in Brenham for four months before moving to College Station. RR 8:155. They were in College State for two or three months before they moved back to Brenham. RR 8:156.

Kimberly testified that, after her breakup with C.L., her parents helped her with a house and a car "and that is when I started doing cocaine." RR 8:156. As Theresa described it, she was helping Kimberly with the rent because Kimberly "had gotten on cocaine and way, pretty much, near death. She was emaciated, sick, desperate for help, wanted help, didn't want the drugs anymore." RR 9:122. Kimberly admitted that she stayed in that home for three months. RR 8:156. Kimberly explained that her parents had offered to pay for the first three months, and "when the fourth month came, I had spent my money, as well as my roommate's money on drugs and, therefore, my roommate decided I should leave." RR 9:11.

Kimberly then testified that she moved in with "K.T." and stayed there almost a year. RR 8:157. Kimberly then testified that she moved in with her friend "T.B." RR 8:157. Kimberly claimed she wasn't doing cocaine at this time. She testified she stayed there almost six months. RR 8:158.

She testified that this was the point that she met David, the father of her child. RR 8:158. Kimberly testified that she started doing drugs again at about this point. RR 8:158-59.

Theresa testified that she lost contact again with her daughter once Kimberly started dating David. RR 9:126.

4

Kimberly admitted she started using methamphetamines when she was 20. RR 8:164. As she explained:

> It was just a[n] every-once-in-awhile thing. A little bit before me and [David] got together I dabbled in it, then when we got together he had also dabbled in it; so therefore, we dabbled in it together.

RR 8:165.

Kimberly testified that she was living in Kingswood with her cousin and his wife when she got pregnant. RR 8:159. Kimberly claimed she was sober during her pregnancy. RR 8:165. She had only been in Kingswood a month when she came back to Brenham for the weekend and David was arrested for a warrant. RR 8:160. As a result of the arrest, "I wound up staying in Brenham," explained Kimberly. RR 8:160. She was living with David's mother at that time for about three months "until I just couldn't deal with her anymore." RR 8:160.

Kimberly testified that she then moved in with her girlfriend "Natalie" for two months before completing the last three months of her pregnancy at Theresa's home. RR 8:160.

When Jennifer was six weeks old, Kimberly and Jennifer started moving around. RR 8:162. Kimberly vacillated between Theresa's home and David's residence, at the home of his uncle. RR 8:163. As Kimberly explained, "Having a baby and trying to live out of a suitcase is not fun." RR 8:163.

Kimberly admitted that she began using illegal drugs again when her daughter was five months old.  RR 8:195.

Kimberly testified she was staying at an unnamed friend's house with David when the Department initially contacted her.  RR 8:161.

### *Reasons for the Department's Involvement in this Case*

Kimberly admitted that Department got involved in her life "[b]ecause of the life-style I was living.  I was using drugs."  RR 8:148.

Aleda Jarvis, a special investigator with the Department, testified that she became involved in this case on August 9, 2013 because of a referral for the neglectful supervision and physical neglect of Jennifer.  RR 8:111-12.  Jennifer was six months old at the time.  RR RR 8:114.  The report alleged that Jennifer's half-sibling, a seven-year old, was taking care of Jennifer and may have witnessed drug use in the home.  RR 1:112-13.  Ms. Jarvis testified that she interviewed the seven-year old, who said she saw her father, David, "smoking a brown cigarette".  RR 8:113.  Officer Eddie Ocanas of the Brenham police department testified that in his opinion brown cigarettes could be "marijuana Swishers", where a cigar is sliced open, the tobacco is removed, marijuana is inserted and then it is wrapped up again.  RR 8:132, 140-41.  Ms. Jarvis also indicated that the seven-year old said she saw her father use a light and a spoon and a shot.  RR 8:113.  Kimberly denied

6

that David used drugs intravenously because, although heavily tattooed, he was afraid of needles.  RR 8:14.

Ms. Jarvis testified that David denied her entry into his residence.  RR 8:114.  Ms. Jarvis indicated that David initially denied drug use, but refused to take a drug test and eventually admitted to smoking marijuana.  RR 8:114.  David told Ms. Jarvis that Kimberly did not live there.  RR 8:114.  However, this is contrary to Kimberly's testimony.  RR 8:161.

Ms. Jarvis eventually interviewed Kimberly.  RR 8:114.  Ms. Jarvis said that Kimberly never gave her a permanent address, but at one point Kimberly indicated she was living in a motel.  RR 8:119.  Ms. Jarvis testified that Kimberly initially denied drug use.  RR 8:115.  Ms. Jarvis indicated that when Kimberly submitted to a drug test, she tested positive for methamphetamines and amphetamines.  RR 8:115.  Ms. Jarvis testified that Kimberly also admitted at that time to taking Xanax not prescribed to her.  RR 8:115.

Kimberly testified that she was "hysterical" when she learned she had failed the drug test.  RR 8:166.  Kimberly admitted that she had tried to clean out her system with pills and mouthwash.  RR 8:166-67.  As Kimberly explained, "But not only that I had failed the drug test, but I had just messed up so big to lose the best thing that ever happened to me."  RR 8:167.

On August 21, 2013, based on the drug test results, Ms. Jarvis asked Kimberly to place Jennifer out of the home. RR 8:115. Ms. Jarvis indicated that Kimberly responded to this request by asking that she leave her parents' home and that Kimberly allow Jennifer to stay with Theresa and her husband Bob. RR 8:116.

Ms. Jarvis testified that at a meeting between the family and the Department, Theresa and Bob indicated that it would be preferable for the Department to file for temporary custody in order to monitor the parents' progress. RR 8:118. At this same meeting David had agreed to take a drug test, but never followed through with it. RR 8:116, 122.

The conclusion of Ms. Jarvis' investigation was that Jennifer had been neglected due to neglectful supervision as the result of the parents' drug use. RR 8:118.

Ms. Jarvis indicated that prior to the adversary hearing, Kimberly told her that there was a history of domestic violence between her and David, and she had left him. RR 8:120.

Ms. Jarvis testified that the Department was appointed the temporary managing conservator of Jennifer on September 26, 2013. RR 8:118.

***The Department created a service plan for Kimberly***

Kimberly admitted that the Department developed a service plan for her. RR 8:170.

Samantha Gonzales was the Department's conservatorship case worker and had been since shortly after September 26, 2013. RR 9:59-61. Ms. Gonzales testified that Kimberly's service plan included

1. completing individual counseling (which was to address parenting and domestic violence issues);

2. a criminal-free lifestyle;

3. having visits with her child;

4. maintaining bimonthly contact with the Department;

5. maintaining stable and legitimate income;

6. completing a psychological evaluation;

7. submitting to random drug screens;

8. completing drug rehabilitation with recommendations (including addressing domestic violence while there); and

9. completing an after-care program.

RR 9:62.

### *Kimberly Failed to Complete her Service Plan*

At trial and on appeal, Kimberly conceded that she did not complete her service plan. RR 9:24; KIMBERLY'S BRIEF, page 19.

Ms. Gonzales testified that Kimberly had a "chronic problem" keeping Ms. Gonzales informed about her living arrangements. RR 9:65. Ms. Gonzales said

that without knowing Kimberly's address or even the city in which she resided, Ms. Gonzales could not set up services. RR 9:79.

Kimberly admitted that she received a referral for a psychological evaluation November 2013. RR 9:17-18. Kimberly claimed that she was unable to follow through on that referral because the first drug rehabilitation facility limited her phone use. RR 9:18.

Ms. Gonzales testified that she had wanted to reestablish services for Kimberly at the time of Kimberly's visit with her child in January, but the visit ended at 5 pm and the drug testing service had to stay open late for a second test, which was required because Kimberly felt like the swab test was inaccurate. RR 9:69.

Ms. Gonzales testified that Kimberly did not call back to reestablish her services. RR 9:69-70. Ms. Gonzales indicated that she "lost contact" with Kimberly "until February." RR 9:69.

Ms. Gonzales testified that she texted Kimberly February 5, 2014, to ask for her address, but she did not receive a response until February 10, 2014. RR 70-71. Kimberly admitted that she falsely told Ms. Gonzales that she was living at an address that was actually the address for David's sister. RR 8:177. Ms. Gonzales indicated that this incorrect address prevented her from communicating to Kimberly regarding an important development in the case. RR 9:72

10

Ms. Gonzales testified that at the permanency conference on February 19, 2014, the Department's primary plan went from reunification to relative adoption. RR 9:73-74.

Ms. Gonzales defended the reasons behind the Department's altering the primary plan:

> We took into account the lack of progress made by both parents up until that point. At that point, they had approximately, like I said, five months to show some progress made. We didn't feel it was significant enough progress to continue with the primary goal of that. Doesn't mean we aren't still working towards reunification. We simply felt it was more appropriate as a concurrent goal. Also, we took into the account that neither parent showed up for the permanency conference as a sign of, I don't know, a lack of interest.

RR 9:73

As Ms. Gonzales continued to explain:

> [W]e . . . felt that perhaps switching the goal could get the attention from the parents and light a fire to realize the seriousness of the situation and kind of get some momentum going with their progress, at that point.

RR 9:73.

Ms. Gonzales testified that Kimberly contacted her again when Kimberly had a visit on April 11, 2014. RR 9:78. Ms. Gonzales indicated Kimberly would not provide her a permanent address even though Ms. Gonzales had requested it. RR 9:78.

11

Ms. Gonzales testified that after April 11, the next time she heard from Kimberly again was in court on May 6, 2014. RR 9:79-80. Ms. Gonzales indicated that she asked Kimberly for her address and Kimberly responded by telling her she was living with a friend and did not know the address. RR 9:80. Ms. Gonzales testified that she asked Kimberly to text the address to her, which Kimberly never did. RR 9:80.

Kimberly claimed she wasn't able to set up her services because she was supposed to go back into drug inpatient treatment for her second stint. RR 9:18-19.

After completion of the second inpatient drug treatment (a mere 47 days prior to trial), Kimberly claimed that she asked to have her services set up, but couldn't explain why it didn't happen. RR 8:1, 184-85; 9:23-24.

Kimberly admitted she never tried to set up the services on her own. RR 9:36-37.

Kimberly admitted that during the pendency of the case, she worked only once – during her first attempt at drug treatment. RR 8:194.

***Kimberly continued to use drugs***

Kimberly initially entered drug rehabilitation on October 17, 2013. RR 8:168. Ms. Gonzales testified that Kimberly tested positive for methampheta-

12

mines, amphetamines, marijuana and Benzodiazepines when she entered the program. RR 9:107.

Kimberly complained about what she felt were the bait-and-switch tactics of the inpatient program.

> I actually got hoaxed into going on terms of 30 days. Once I got there they told me it wasn't 30 days, it was 60 days, and I needed to stay for 60 days. It's whatever the counselor thought. If you needed more time, you'd have to stay.

RR 8:168. Kimberly admitted that she did not go into drug rehabilitation the first time with the right attitude. RR 8:171. Kimberly conceded that she did not take rehab seriously at that point, and she did not want to change. RR 9:16. As she explained, "I felt like I was forced. I didn't want to go. I thought that I could do this and then still continue to use the drugs, just not get caught on the drug test." RR 8:170. Additionally, Kimberly testified, "I didn't go in with a clear wanting, hit-rock-bottom wanting this for myself, as well as for my daughter." RR 8:170. Kimberly explained, "I was just ready to get out. I was counting the days until I got out." RR 9:17.

Kimberly testified that the rehabilitation center discharged her on December 16, 2013. RR 8:171. The rehabilitation center upon discharge recommended a 90-day intensive outpatient program which could have been completed in Beaumont but would have been difficult completing in Brenham. RR 8:171. Ms. Gonzales

explained that Kimberly was assigned a sponsor and was supposed to participate in a 12-step program. RR 9:64.

Kimberly admitted she relapsed on New Year's Eve. RR 8:173-74.

Kimberly admitted that she tested positive for methamphetamines, amphetamines and marijuana on January 22, 2014, when she was trying to set up a visit with Jennifer. RR 8:175, 9:68. Ms. Gonzales testified that when the swab test came back dirty, Kimberly assured her "there's no way she should have been positive." RR 9:68. However, the urinalysis confirmed the original result from the swab. RR 9:68.

Ms. Gonzales testified that in the middle of March, 2014, there was an allegation that Kimberly was living with a friend in the Brenham Housing Authority subdivision and that the two of them were using methamphetamines and children were in the home. RR 9:75. Ms. Gonzales testified that she found Kimberly in that residence, and told her that if Kimberly continued to get these allegations regarding drug use in the home, there was a risk that those children could be removed as well. RR 9:75-76.

Ms. Gonzales described the following as Kimberly's reaction to this conversation:

> She told me that she was sick and tired of being in that life-style, that she didn't want to be with [David] any more, that she was going to go to rehab, and that she was going to go as soon as possible, and that she was ready to -- ready to, you know, go back to rehab and get clean.

14

RR 9:76.

In March 2014, Kimberly testified that she discussed her drug use with Officer Ocanas. RR 8:180. Officer Ocanas testified that she admitted to him that she was using methamphetamine, and mentioned going to rehab. RR 8:139, 180.

Kimberly admitted that she tested positive for methamphetamines and amphetamines and admitted to marijuana use in April. RR 8:182.

Kimberly admitted that on June 5, 2014, 95 days prior to trial, she tested positive for methamphetamines, amphetamines and marijuana. RR 8:1, 183.

Kimberly testified that she enrolled in a second drug rehab program June 25, 2014, 75 days prior to trial. RR 8:1, 184. She claimed to have been clean for "a little over two and a half months" by the time of trial. RR 8:195. The following is from the Department's examination of Kimberly:

> Q.    Okay. This case started in August of 2013, that was when you first were told you needed to go to rehab, and now it's finally sinking in in June of 2014. Is that what you're telling this jury?
>
> A.    Yeah, better late than never.

RR 8:184.

The second rehab was 28 days in length, meaning that it concluded 47 days prior to trial. RR 8:1, 184-85.

Initially, on the first day of trial, when asked if Austin Recovery Center, the location of the second drug inpatient program, suggested any type of follow-up

15

care, Kimberly responded, "Not that I'm aware of." RR 8:185. When asked about going to a sober home in Austin, Kimberly replied, "It wasn't a have-to thing." RR 8:186. Ms. Gonzales, on the other hand, testified that Kimberly's case manager had said that Kimberly was going to need aftercare. RR 9:83.

Kimberly testified that she had had a sponsor in Austin, but had not yet gained one since she had moved back to Brenham. RR 9:42.

Kimberly admitted to filling a prescription for 16 pills of hydrocodone after completion of the second stint in drug rehabilitation. RR 9:48.

### *Kimberly's unstable housing during the Department's involvement*

Kimberly indicated that the day after the completion of the first drug rehabilitation program she moved in with her grandmother in Beaumont, but attempted to get subsidized housing in Brenham. RR 8:171. Before the Brenham housing application came through, Kimberly decided to move in with David at a hotel in Hempstead until the end of February. RR 8:173, 177.

Ms. Gonzales testified that in the middle of March, 2014, there was an allegation that Kimberly was living with a friend in the Brenham Housing Authority subdivision. RR 9:75.

Kimberly testified that she and David had moved to a new hotel by March 2014. RR 8:178.

16

Kimberly claimed that she moved in with a friend named "J.M." (no relation) because she wanted to get away from David. RR 8:180. That lasted for about a month. RR 8:182.

Thereafter, Kimberly and David stayed at a house with "a friend" before moving into yet another hotel in Waller. RR 8:182-83.

After David was arrested in May 2014, Kimberly testified that she lived in "Bluebonnet Hills" with a friend she called "Clayton". RR 7:183, 8:136.

Kimberly testified that she was residing at the time of trial with her uncle in Hempstead, explaining "I decided I wanted to stay around my family and try to work on relationships with them." RR 8:185-86.

**Kimberly's lack of contact with Jennifer**

Theresa described Kimberly's contact with Jennifer from August 2013 to June 2014 with one word, "Inconsistent." RR 9:150.

When Kimberly initially placed Jennifer voluntarily with Theresa, Kimberly testified she went to see Jennifer daily, and "would walk back and forth to visits with not even a thought." RR 9:14. At the time of the first rehab, Kimberly was making scheduled visits with Jennifer. RR 9:19. Kimberly contacted Ms. Gonzales to set up a visit with her child January 22, 2014. RR 9:66. Thereafter, Ms. Gonzales "lost contact" with Kimberly. RR 9:69. At the point where relapse because a concern, visits went from being supervised by placement to being super-

vised by the Department. RR 9:110. The record indicates that Kimberly then contacted Ms. Gonzales for a visit on April 11, 2014. RR 9:78. Ms. Gonzales didn't hear from her again until a court date on May 6, 2014. RR 9:79-80.

Kimberly was supposed to see Jennifer right before admitting herself to rehab the second time, but Kimberly explained that she had been up late packing and had slept through her alarm, and she claimed she did not want to be late to Austin Recovery Center. RR 8:184-85. Ms. Gonzales explained that all visits – including this scheduled 30 minute visit – are cancelled if the parent is 15 minutes late, as was the case here. RR 9:83.

From May until the beginning of trial on September 8, 2014, Kimberly saw Jennifer a total of six times. RR 8:189.

### Kimberly's association with drug culture, including David

In that same period of time, from May 6 to September 8, Kimberly saw David while he was incarcerated a total of seven times – May 11, May 18, May 26, June 15, August 8, August 10 and September 5 (a mere three days before trial). RR 8:1, 189. Kimberly admitted she "was there to be supportive of him." RR 8:189. At least once, she used Joshua Bryant, whom Officer Ocanas had identified as a drug dealer, as her ride to the jail. RR 8:136, 188

Kimberly admitted that David came to see her every weekend she was at the first drug rehabilitation program. RR 8:169.

18

Kimberly testified that she moved in with David at a Hotel in Hempstead on New Year's Eve when she relapsed. RR 8:173-74.

Officer Ocanas testified that it was his understanding that Kimberly was in the car January 29, 2014, the night he handled a "controlled purchase" of drugs as part of his investigation against David. RR 8:140.

Kimberly testified at that one point in February she was living with David at a hotel. RR 8:177. Kimberly testified that they moved to a new hotel by March 2014, and David was selling drugs to pay for the room. RR 8:178.

Officer Ocanas testified that Theresa and Bob contacted him March 16, 2014, alerting him that they were worried because Kimberly told them David had assaulted her. RR 8:137. Kimberly admitted that she told her parents David had put a gun to her head in the hotel, although she later claimed it had not occurred on that particular date. RR 8:138, 178-79. Kimberly admitted to Ocanas that she was using methamphetamine, and mentioned going to rehab. RR 8:139, 180.

The next time Officer Ocanas ran into Kimberly, he was serving a warrant against David in May 2014 at the residence of David's mother. RR 8:136. At the time Officer Ocanas was affecting the arrest, Kimberly got in a vehicle with Joshua Bryant, a drug dealer against whom Officer Ocanas had made drug cases. RR 8:136-37.

19

### Kimberly's Plans

On the first day of trial, Kimberly testified that her "permanent plan" was to live with her uncle in Hempstead. RR 8:196. She indicated that she had just gotten a job at Brookshire Brothers in Hempstead, and was going to start when the trial concluded. RR 8:196, 9:26. Kimberly indicated that she was going to stay there and work on "trying to get my feet underneath me from the road I just got off of." RR 8:196.

On the second day of trial, Kimberly testified that her aunt in Houston offered with a four-bedroom home for Kimberly and Jennifer. RR 9:52. When asked about the logistics of working in Hempstead and living in Houston, she later back off of this, indicating that "this is not a for sure thing." RR 9:55.

Kimberly admitted that she had "not yet" looked into daycares for Jennifer, and did not know how much they would cost. RR 9:53, 56.

### Department's Plans

Ms. Jarvis indicated that Kimberly placed Jennifer with Theresa and Bob August 21, 2013. RR 8:115-16. Ms. Gonzales testified that the Department's primary plan was relative adoption. RR 9:73. Theresa and Bob have worked out a division of labor between the two of them, and have adjusted to life with a baby. RR 9:133, 166. They already set up day care. RR 9:133.

Ms. Melissa Brod, the Department's supervisor in this case, indicated that the state of Texas is not a good long-term parent for children. RR 9:183. She explained that a child in the first three years of life needs stability to trust and bond with the people caring for them. RR 9:188.

Bob, Theresa's husband, indicated that the two of them would adopt if Kimberly's parental rights were terminated. RR 9:168-69. Theresa explained that the following would happen if the jury were to allow for adoption:

> We're going to continue to do what we've been doing. We're going to keep her in a Christian day care, and then, subsequently, you know, make decisions about elementary schools and so forth. We're going to give her a good, strong, firm foundation. A constant home that she can depend on every day and we are just going to love her.

RR 9:133. Theresa testified that she and her husband had been living in the same home for sixteen years. RR 9:138, 148.

Theresa and Bob told the jury that she intended to keep Kimberly involved in Jennifer's life as long as Kimberly was sober. RR 9:140-41, 170.

## SUMMARY OF THE ARGUMENT

In Kimberly's second issue, she contends that the evidence is legally insufficient to support the jury's finding that termination is in the best interest of the child. Kimberly began using drugs ten years ago, and began abusing methamphetamines, her apparent drug of choice, five years ago. She admitted that she did not take her first stint in drug rehabilitation seriously, she relapsed, she did not com-

21

plete her second attempt at drug rehabilitation until 47 days prior to trial, and never completed her required aftercare for either attempt at drug rehabilitation. There was also domestic violence between herself and David prior to the filing of this case, and he put a gun to her head during the pendency of the case. Kimberly never began counseling to address the domestic violence issues, and from May until the time of trial in September, Kimberly saw David in jail more often than she saw Jennifer. Additionally, Kimberly has a life-long issue with stable housing and employment. The jury was empowered by this evidence to see Kimberly's lack of motivation to correct the issues that caused Jennifer to be brought into care and conclude with a firm conviction that past will be prologue, and Jennifer is better off with the stability of her grandmother.

In her first issue, Kimberly complains that the trial court should have warned her at the initial hearing about her right to an attorney, and should have appointed an attorney prior to the February hearing. However, the duty to warn only exists for removal hearings prior to which the Department already had custody of the child. Because the Department did not have custody until after that hearing, and Kimberly supported the Department having custody, there was no duty to warn. Because the trial court appointed Kimberly an attorney once she appeared in opposition to the Department, nearly seven months prior to trial, the trial court did not err in the timing of the appointment.

All of Kimberly's issues should be overruled and the trial court's order of termination should be affirmed.

## STANDARD OF REVIEW

### A.    Clear and Convincing Burden of Proof

To terminate parental rights, the Department must prove by clear and convincing evidence that:  (i) a parent committed one of the acts or omissions set out in Family Code section 161.001(1); and (ii) the termination of parental rights is in the child's best interest.  TEX. FAM. CODE § 161.001 (Lexis 2014); *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).  Clear and convincing evidence is described as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007 (Lexis 2014); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994). Although parental rights are of constitutional dimension, the Supreme Court has explained that an appellate courts review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt and held that it is essential that courts recognize that parental rights are not absolute and that the emotional and physical interests of children should not be sacrificed to preserve that right. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

**B.     Standard of Conducting Legal and Factual Sufficiency Review**

In reviewing the evidence for legal sufficiency in a parental termination case, the court must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002). The court must review all the evidence in the light most favorable to the finding and judgment; meaning that the court assumes that the factfinder resolved all disputed evidence in favor of the finding if a reasonable factfinder could do so, and disregards all evidence a reasonable factfinder could have disbelieved. *Id.* However, the court considers undisputed evidence, even if it is contrary to the finding. *Id.*

Kimberly does not challenge the factual sufficiency finding that termination is in the best interest of Jennifer. *See* KIMBERLY'S BRIEF, page vii ("Appellant attacks the *legal* sufficiency of the evidence") (emphasis added). Nevertheless, in reviewing the evidence for factual sufficiency, in determining whether the evidence is such that a factfinder could have reasonably formed a firm belief or conviction that its finding was true, the court considers whether disputed evidence is such that a factfinder could not have reasonably formed a firm belief or conviction in the truth of its finding. *Id.* The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a factfinder could not have reasonably

credited in favor of the finding is so significant that the factfinder could not have reasonably formed a firm belief or conviction in the truth of its finding.  *Id.*

## C. Trier of Fact Has the Authority to Resolve Credibility Issues and Conflicts in the Evidence

The clear-and-convincing evidence standard does not mean that the evidence must negate all reasonable doubt or that the evidence must be uncontroverted.  *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ).  As a reviewing court conducts a factual-sufficiency review, it must maintain the respective constitutional roles that exist between the factfinder and the reviewing court.  *C.H.*, 89 S.W.3d at 27.  The appellate court cannot substitute its own judgment for that of the factfinder.  *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998), cert. denied, 525 U.S. 1017 (1998).  The factfinder has the sole authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences.  *R.D.S.*, 902 S.W.2d at 716.  The factfinder also enjoys the right to resolve credibility issues and conflicts within the evidence and may freely choose to believe all, part, or none of the testimony espoused by any particular witness.  *Id.* (citing to *In re E.S.M.*, 550 S.W.2d 749, 757 (Tex. Civ. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.)) (judge was entitled to disbelieve the testimony of the biological parent).  Where conflicting evidence is present, the factfinder's determination on such matters is generally regarded as conclusive.  *In re B.R.*, 950 S.W.2d 113, 121 (Tex. App.—El Paso 1997, no writ).

The Texas Supreme Court expounded on the importance of giving deference to the trier of fact in accessing the credibility of witnesses and cautioned against the reweighing of the evidence, when it wrote:

> A brief response to the dissenting justices' depiction of the record in this case is warranted. Both dissents effectively second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible. Even under the standard we articulated in *In re J.F.C.*, this reweighing of the evidence is improper. *J.F.C.*, 96 S.W.3d at 266. And in a case like this, where so much turns on the witnesses' credibility and state of mind, appellate factfinding is particularly dangerous.

*In re L.M.I.,* 119 S.W.3d 707, 712 (Tex. 2003).

## ARGUMENT

I.  **RESPONSE TO KIMBERLY'S ISSUE TWO:** The evidence established that Kimberly has a five year history of methamphetamine abuse. After drug treatment in this case, she failed to complete aftercare and relapsed. She did not complete a second drug treatment program until 47 days prior to trial. She did not participate in individual therapy to address domestic violence, and in the last few months of the case saw the man who put a gun to her head more often than the child. She failed to maintain stable housing before and throughout the pendency of the case. The Department's plan is to have the maternal grandmother adopt. Is the evidence legally sufficient to support the finding that termination of Kimberly's parental rights was in the child's best interest under Family Code subsection 161.001(2)?

Kimberly concedes that the evidence is legally sufficient to support termination under TEX. FAM. CODE § 161.001(1)(D), (N), (O) and (P). KIMBERLY'S BRIEF 19. She does not contest factual sufficiency of any element. KIMBERLY'S BRIEF

26

17-19. In her second issue, Kimberly contests only the legal sufficiency of the evidence to support the jury's finding that termination was in the best interest of the child. KIMBERLY'S BRIEF 20-24. This issue should be overruled.

Termination of the parent-child relationship can only occur if termination is in the best interest of the child. TEX. FAM. CODE § 161.001(2); APPENDIX 3. The focus is on the best interest of the child, not the best interest of the parent. *See Dupree v. Tex. Dep't. of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

## A.   The *Holley* Factors

The Texas Supreme Court has recognized nine non-exhaustive factors that a court may consider in determining whether termination is in a child's best interest.[3] *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The Department, as the party seeking termination, is not required to prove all nine factors. *C.H.*, 89 S.W.3d at 27. The analysis of evidence relating to one factor may be adequate in a particular situation to support a finding that termination is in the best interest of the child. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.). A best interest

---

[3] The *Holley* factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist these persons; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d at 367, 372 (Tex. 1976).

analysis may be based not only on direct evidence, but also circumstantial evidence, subjective factors, and the totality of the evidence as a whole. *In re S.H.A.*, 728 S.W.2d 73, 86 (Tex. App.—1987 writ ref'd n.r.e.). Evidence supporting termination of parental rights is also probative of best interest. *C.H.*, 89 S.W.3d at 28, 45. Sometimes the evidence of the parent's behavior may be sufficient to allow a fact finder to reasonably form a belief or conviction that termination is in the child's best interest. *In re Z.S.*, ___S.W.3d ___, No. 05-13-01614-CV, 2014 Tex. App. LEXIS 2958 (Tex. App.–Dallas, March 17, 2014, no pet.) (citing *C.H.*, 89 S.W.3d at 28; *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.))[4];

As the Thirteenth Court aptly stated in its best interest analysis: "Specifically, cases that involve endangering drug abuse are not the types of cases where the parent's wrongful conduct should be ignored." *In re C.C.*, No. 13-07-00541-CV, 2009 Tex. App. LEXIS 2239, at *30-*31 (Tex. App.—Corpus Christi Apr. 2, 2009, pet. denied) (mem. op.). "In particular, a parent's drug use and failure to comply with a family service plan support a finding that termination is in the best interest of the child." *Id.*

---

[4] This case law stands in contrast to Kimberly's assertion that "the acts or omissions of a parent which lead to Department intervention *cannot*, standing alone justify a finding that termination is in the best interest of the child." KIMBERLY'S BRIEF 23 (emphasis added). The Department would also note that the cases Kimberly cites as authority do not directly support her proposition. KIMBERLY'S BRIEF 23.

## B.      Evidence Relevant to Best Interest Determination

*Desires of the child*

When a child is too young to express their desires, the factfinder may consider that the child has bonded with the proposed-adoptive family, is well cared for by them, and has spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The child in this case was only 19 months old at the time of trial.  RR 8:1, 162, 9:129.

Kimberly testified that she attended her regularly scheduled visits with the child early on in the case.  RR 9:14, 19, 66.  Theresa, on the other hand, described the contact from August 2013 to June 2014 as "[i]nconsistent."  RR 9:150.  Nevertheless, after January 22, 2014, when visits were no longer supervised by placement, Ms. Gonzales testified that Kimberly "lost contact" with her.  RR 9:69, 110.  Kimberly contacted Ms. Gonzales for a visit once in April 2014, but Ms. Gonzales didn't hear from Kimberly again until a court date in May 2014.  RR 9:78-80, 110.  From May 2014 until the September 2014 trial, Kimberly saw Jennifer only six times, but saw David, the man who put a gun to her head, seven times during the same time frame.  RR 8:139, 179, 9:189.  Kimberly once missed a visit because she slept through her alarm clock.  RR 9:184.

Theresa responded in the following manner when asked about how taking care of her granddaughter has changed her life:

> Well, I don't know where to begin. Changed in so many ways. We own a business and my husband works out of town or he works in Houston every day. So total adjustment in your life of now we've got to wake up and get a baby ready, get her to school, then go to work, and then leave work early so you can go get her, get her dinner, all those things. Not a lot of going out and, you know, your Saturdays are full of taking care of a baby. They're certainly not let's go run and go out of town for the weekend or – it's just changed. It's changed in every single way. It's a total different life now that we have a baby.

RR 9:133. In talking about Jennifer, Theresa testified that "we're just going to love her." RR 9:133.

Theresa's husband Bob also testified in detail about the substantial care they provide for Jennifer.

> We have a system and, basically, in the mornings we try to keep it where I usually go get her up because [Theresa's] knees aren't the best right now. She's had knee problems. So I go up the stairs and get her, bring her down and we have -- we hang out in the bed and watch TV in the mornings. I go get ready and [Theresa] takes her to get fed and gets her dressed. I come down and take her to school. I go to work. I work in Houston every day. I go to work and [Theresa] goes to work, then we – [Theresa] usually picks her up. I usually don't get home early enough. Every once in awhile, I pick her up. And then my job in the evening is mainly -- a lot of times I feed her or if I'm not feeding her, I bathe her or get her tub ready. I'm the – I try to keep everything going, and then get her bed ready and her room ready, then [Theresa] has chosen -- she wants to put her to bed every night. I let her do that.

RR 9:166.

30

The jury could considered the "minimal time" Kimberly spent with Jennifer and the evidence that Jennifer was loved and well cared for by, and bonded to, Theresa and Bob in support of its best interest finding. *J.D.*, 436 S.W.3d at 118. This supports the best interest finding.

### *The Emotional and Physical Needs of the Child Now and in the Future*
### *The Emotional and Physical Danger to the Child Now and in the Future*

The Department will address these factors together.

The factors of emotional and physical needs of the child, and the emotional and physical dangers to the child, favor termination.

The unchallenged predicate findings under section 161.001(1)(E), endangering conduct, are binding and may be considered as evidence related to the court's best interest finding. *In re G.S.*, No 14-14-00477-CV, 2014 Tex. App. LEXIS 10563, at *30 (Tex. App.–Houston [14th Dist.], September 23, 2014, no pet.) (mem. op.).

A parent's drug use supports a finding that termination is in the best interest of the child. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). The factfinder can give "great weight" to the "significant factor" of drug-related conduct. *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.) (quoting *Dupree*, 907 S.W.2d at 86); *see also In re J.N.H.*, No. 02-11-00075-CV, 2011 WL 5607614, at *8, 2011 Tex. App. LEXIS 9199, at * 14 (Tex. App.—Fort Worth, Nov. 17, 2011, no pet.) (mem. op.) (considering a parent's criminal

and drug histories in affirming a trial court's decision that termination was in the best interest of a child). A parent's continued drug use demonstrates "an inability to provide for [the child's] emotional and physical needs and provide a stable environment for" the child. *In re F.A.R.*, No. 11-04-00014-CV, 2005 Tex. App. LEXIS 234, at *11-*12 (Tex. App.—Eastland Jan. 13, 2005, no pet.) (mem. op.). "Because there is evidence that appellant's past actions [relating to drug use] were unsuitable, the court could have inferred that similar unsuitable conduct could recur in the future if the [child is] returned to appellant." *In re E.A.*, No. 13-06-503-CV, 2007 Tex. App. LEXIS 7159, at *24-*25 (Tex. App.—Corpus Christi Aug. 31, 2007, no pet.) (mem. op.). In deciding the best interest question, the factfinder is permitted to consider the evidence supporting its finding that frequent and long–term drug use endangered the child's welfare. *Toliver v. Tex. Dep't of Family and Protective Servs.*, 217 S.W.3d 85, 102 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Evidence of a parent's history of exposing her child to domestic violence weighs in favor of termination. *In re A.M.*, 385 S.W.3d 74, 82-83 (Tex. App. – Waco 2012, pet denied).

A factfinder may measure a parent's future conduct by her past conduct and determine that it is in a child's best interest to terminate her parental rights. *Davis v. Travis County Child Welfare Unit*, 564 S.W.2d 415, 421 (Tex. Civ. App.—

Austin 1978, no writ).  A factfinder may infer that a parent's past inability to meet a child's physical and emotional needs at the time the child was in the parent's custody may indicate the parent's future inability to meet the child's physical and emotional needs if the child is returned to the parent.  *D.O. v. Tex. Dep't. of Human Servs.*, 851 S.W.2d 351, 356 (Tex. App.—Austin 1993, no writ); *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *In re D.S.,* 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.) (Parent's future conduct may be measured by his or her past conduct in determining whether it is in child's best interest to terminate parental rights).  "Because there is evidence that appellant's past actions [relating to drug use] were unsuitable, the trial court could have inferred that similar unsuitable conduct could recur in the future if the children are returned to appellant."  *E.A.*, 2007 Tex. App. LEXIS 7159, at *25.  The factfinder can infer that the "identified risk factors establish[ing] endangerment . . . in the past . . . would continue to be present thus endangering the children's well-being in the future if the children are returned" to the parent.  *In re V.A.*, No. 13-06-237-CV, 2007 Tex. App. LEXIS 805, at *17-*18 (Tex. App.—Corpus Christi Feb. 1, 2007, no pet.) (mem. op).

Additionally, "[m]any of the reasons supporting termination under subsection O also support the trial court's best interest finding."  *In re E.C.R.*, 402

S.W.3d 239, 249 (Tex. 2013). A parent's failure to complete those services direct-ly related to the underlying reasons for the removal is evidence that the children would continue to be in danger if they were returned to her. *In re A.B.*, No. 04-13-00246-CV, 2013 Tex. App. LEXIS 10841 at *5 (Tex. App.–San Antonio, August 28, 2013, no pet.) (mem. op.); *see also In re O.N.H.*, 401 S.W.3d 681, 687 (Tex. App.—San Antonio 2013, no pet.) (father's lack of compliance with his service plan showed he was not learning how to protect his children from his wife's severe alcoholism).

On appeal, Kimberly does not contest that there was sufficient evidence to terminate pursuant to TEX. FAM. CODE §§ 161.001(1)(D), (E), (O) and (P). *See* KIMBERLY'S BRIEF 19 ("Appellant cannot in good faith challenge the evidence with regard to the predicate grounds for termination"). In this case, there is evi-dence of drug use and domestic violence, but Kimberly did not complete the ser-vices needed to address these issues.

Kimberly's drug use has not been sufficiently addressed. Kimberly used co-caine and crushed her Adderall ten years ago when she was 15. RR 8:1, 150, 190. Because of the cocaine use, at one point "[s]he was emaciated, sick, desperate for help, wanted help, [and] didn't want the drugs anymore." RR 9:122. Kimberly was using methamphetamine by the age of 20, five years ago. RR 8:1, 148, 164.

At the point that methamphetamine use was an "every-once-in-a-while thing", she got involved with David. RR 8:158, 158-59, 165.

Because the child was removed due to Kimberly's "life-style" of drug use, drug rehabilitation and aftercare were part of her service plan. RR 8:148, 9:62. Kimberly began her first drug treatment during the case October 17, 2013. RR 8:168. She tested positive for methamphetamine, amphetamine, marijuana and Benzodiazepines at that time. RR 9:107. After completing that program, she failed to enroll in the recommended 90-day intensive outpatient program. RR 8:171. Kimberly again tested positive for methamphetamine, amphetamine and marijuana in January 2014. RR 8:175. Kimberly was in the car with David in January 2014 when Officer Ocanas was handling a "controlled purchase" of drugs as part of his investigation against David. RR 8:140. In March 2014, there was an allegation that Kimberly was living with a friend in the Brenham Housing Authority subdivision and that the two of them were using methamphetamine while children were in the home. RR 9:75. Kimberly admitted that she tested positive for methamphetamine and amphetamine and admitted she used marijuana April 2014. RR 8:182. In June 2014, 95 days prior to trial, Kimberly again tested positive for methamphetamine, amphetamine and marijuana. RR 8:1, 183. She completed her second attempt at drug treatment 47 days prior to trial. RR 8:1, 185. Kimberly denied under oath that the second rehab center required aftercare, but Ms. Gonzales

testified that Kimberly's case manager at the Austin Recovery Center said it was required after Kimberly's completion of her second drug treatment program. RR 8:185, 9:83.

Prior to the removal, there was a history of domestic violence between Kimberly and David. RR 8:120. This is why the service plan included addressing domestic violence in drug rehabilitation and individual counseling. RR 9:62. The Department was not able to set up counseling because Kimberly was in drug rehabilitation, or would not return phone calls, or did not let the Department know what city she was living in. RR 9:24, 69, 70, 79, 82. During the pendency of this case, David put a gun to Kimberly's head. RR 8:138, 178-79. Kimberly repeatedly stated that she would leave David, before eventually reuniting with him. RR 8:178, 180, 9:76, 78. From May 2014 until the time of trial, Kimberly went to see David in jail (at least once using a drug dealer for a ride) more often than she visited Jennifer. RR 8:189.

As a factfinder can give "great weight" to the "significant factor" of drug-related conduct, the trial court could have considered Kimberly's admitted history of drug use, and that she continued to consume illegal substances knowing her parental rights were in jeopardy, and concluded that termination of her parental rights is in Jennifer's best interest. *J.O.A.*, 283 S.W.3d at 346; *Dupree*, 907 S.W.2d at 86; *F.A.R.*, 2005 Tex. App. LEXIS 234, at *11-*12 (continued drug use demon-

strates "an inability to provide for [the child's] emotional physical needs" and provide a stable environment for" the child); *Toliver*, 217 S.W.3d at 102. The trial court also could have inferred that Kimberly's drug use would continue in the future, especially in light of her failure to comply with outpatient drug treatment. *E.A.*, 2007 Tex. App. LEXIS 7159, at *24-*25 ("[b]ecause there is evidence that appellant's past actions [relating to drug use] were unsuitable, the court could have inferred that similar unsuitable conduct could recur in the future if the [child is] returned to appellant."). Considering this evidence, the trial court could have determined that Kimberly's drug and alcohol use present an emotional danger to Jennifer as she would come in and out of her life, thereby disrupting any permanency or stability for the child. *B.S.W.*, 2004 Tex. App. LEXIS 11695, at *25-26 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.).

Additionally, the jury could have properly considered: (1) Kimberly's history of crushing and snorting her Adderall pills; (2) her 5-year history of methamphetamine use; (3) her repeated use of methamphetamine, amphetamine and marijuana during this case when she knew her parental rights were in jeopardy; (4) her repeated failure to participate in required aftercare after her two stints in drug treatment; (5) the domestic violence between David and Kimberly, including the incident in which David put a gun to Kimberly's head during the pendency of this case; (6) Kimberly's failure to end her abusive relationship with David by repeat-

edly promising to leave him before reuniting with him; (7) Kimberly's visitation with David compared to Kimberly's visitation with Jennifer; (8) her failure to address domestic violence in individual counseling; and, (9) Kimberly's housing instability before and throughout the case, and as "[p]ast is often prologue", concluded that Kimberly would continue to expose Jennifer to emotional and physical danger, and would be unable meet the child's emotional and physical needs now and in the future, supporting its best interest determination. *May*, 829 S.W.2d at 377; *Ray*, 832 S.W.2d at; *D.S.,* 333 S.W.3d at 384; *E.A.*, 2007 Tex. App. LEXIS 7159, at *25; *V.A.*, No. 13-06-237-CV, 2007 Tex. App. LEXIS 805 at *17-*18; *A.B.*, 2013 Tex. App. LEXIS 10841 at *5; *O.N.H.*, 401 S.W.3d at 687.

### *The Parenting Ability of the Individuals Seeking Custody*
### *The Programs Available to Assist the Party Seeking Custody*

The Department will address these two factors together.

The evidence of Kimberly's parenting abilities, or lack thereof, favor termination as well.

A parent's inability to provide adequate care for a child, lack of parenting skills, and poor judgment may be considered when looking at the child's best interests. *In re C.A.J.,* 122 S.W.3d 888, 893 (Tex. App.–Fort Worth 2003, no pet.). Parental drug abuse is obviously reflective of poor judgment and is also a factor to be considered in determining a child's best interests. *M.R.,* 243 S.W.3d at 820. A parent's lack of motivation to learn how to improve parenting skills is evidence

38

supporting the best interest determination. *Wilson v. State*, 116 S.W.3d 923, 930 (Tex. App.—Dallas 2003, no pet.). In reviewing the parental abilities of a parent, a factfinder can consider the parent's past neglect or inability to meet the physical and emotional needs of the children. *D.O.*, 851 S.W.2d at 358. Further, the fact-finder can infer from a parent's failure to take the initiative to avail herself of the programs offered by the Department that the parent "did not have the ability to motivate herself to seek out available resources needed now or in the future". *In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.). A parent's "showing of poor judgment currently and in the past" demonstrates an inability to provide adequate care for the child. *Wischer v. Tex. Dep't of Family and Protective Servs.*, No. 03-12-00165-CV, 2012 Tex. App. LEXIS 7523, at *36 (Tex. App.—Austin Aug. 29, 2012, no pet.) (mem. op.). A parent's testimony regarding his "hopes and desires for the future", without demonstration of the necessary changes to accomplish those goals "reveals that [the parent] was [not] motivated to improve or to learn how to improve [his/her] parenting skills." *In re C.N.C.*, No. 13-12-00164, 2012 Tex. App. LEXIS 7431, *23 (Tex. App.—Corpus Christi Aug. 27, 2012, no pet.) (mem. op.).

Kimberly had a five year history of abusing methamphetamine at the time of trial. RR 8:1, 148, 164. She admitted that the first time she entered a drug rehabilitation program, she felt "hoaxed" about the amount of time she was required to be

there, and she was more interested in not getting caught on future drug tests than in staying clean. RR 8:168, 170. She was discharged from drug rehabilitation on December 16, 2013, failed to attend required aftercare, and admittedly relapsed two weeks later on New Year's Eve. RR 8:171, 173-74. By March 2014, Kimberly talked to both Ms. Gonzales and Officer Ocanas about going back to drug treatment "as soon as possible". RR 8:139, 180, 9:76. She actually didn't admit herself to a second drug rehabilitation program until June 2014, 75 days prior to trial. RR 8:1, 184. After her second drug treatment Kimberly again failed to attend required aftercare. RR 8:185, 9:83. Kimberly admitted to filling a prescription for 16 pills of hydrocodone after completion of the second attempt at drug rehabilitation. RR 9:48.

Kimberly concedes she did not complete her court ordered services in violation of subsection (O). KIMBERLY'S BRIEF 19. The evidence shows Kimberly made no attempt to set up services on her own. RR 9:37. Significantly, the Department could not set up Kimberly's services because she was in drug treatment, or would not return phone calls, or did not let the Department know what city she was living in. RR 9:24, 62, 69, 70, 79, 82.

The jury could have considered this evidence that Kimberly: (1) abused drugs prior to the case and continued abusing drugs during the case when she knew her rights were in jeopardy; (2) failed to participate in aftercare following her ini-

40

tial drug treatment, and relapsed; (3) again failed to participate in aftercare following her second drug treatment; (4) remained in an abusive relationship that included domestic violence during the pendency of the case; (5) did not participate in the required counseling to address domestic violence; (6) lacked stable housing and employment throughout the pendency of the case; and, (7) only sporadically attended visitation with the child during the pendency of the case, and determined that Kimberly had poor parenting skills, was not motivated to improve them, did not timely avail herself of programs offered by the Department, and would not have the ability to motivate herself to seek out available resources needed now or in the future. *Wilson*, 116 S.W.3d at 925; *J.N.R.*, 982 S.W.2d at 143 *W.E.C.*, 110 S.W.3d at 245; *D.O.*, 851 S.W.2d at 356.

These factors weigh heavily in favor of the jury's best interest determination.

### *The Plans for the Child by the Individuals or by the Agency Seeking Custody*

The factfinder may compare the parent's and the Department's plans for the child and can consider whether the plans and expectations of each party are realistic or weak and ill-defined. *D.O.*, 851 S.W.2d at 356. "Evidence of a recent improvement does not absolve a parent of a history of irresponsible choices." *In re S.P.M.,* No. 07-13-00282-CV, 2014 Tex. App. LEXIS 614, at *24 (Tex. App.—Amarillo Jan. 21, 2014, no pet.) (mem. op.) (citations omitted). "Given [parents']

41

past performance, the trial court, as fact finder, was free to reject [parents'] assertions of future stability and having learned from their mistakes." *Id*. at \*25.

Kimberly had a five year history of abusing methamphetamine by the time of trial. RR 8:1, 148, 164. She admitted that the first time she entered a drug rehabilitation program during the case, she felt "hoaxed" about the amount of time she was required to be there, and she was more interested in not getting caught on future drug tests than she was interested in staying clean. RR 8:168, 170. She was discharged from drug rehabilitation in December 2013, failed to attend aftercare, and admitted to relapsing on New Year's Eve. RR 8:171, 173-74. By March, 2014, Kimberly talked to both Ms. Gonzales and Officer Ocanas about going back to rehab "as soon as possible". RR 8:139, 180, 9:76. She did not enter a second drug rehabilitation program until June 2014, 75 days prior to trial. RR 8:1, 184. After her second drug treatment, she failed to attend aftercare. RR 8:185, 9:83. Kimberly admitted to filling a prescription for 16 pills of hydrocodone after completion of the second drug treatment program. RR 9:48.

On the first day of trial, Kimberly claimed that her "permanent plan" was to live with her uncle in Hempstead, Texas. RR 8:196. She indicated that she had just gotten a job at a grocery store in Hempstead, and was going to start that job after trial. RR 8:196, 9:26. Kimberly claimed that she was going to stay there and

work on "trying to get my feet underneath me from the road I just got off of."  RR 8:196.

By the second day of trial, however, Kimberly claimed that her aunt in Houston offered her a four-bedroom home for Kimberly and Jennifer to live in.  RR 9:52.  When asked about the logistics of working in Hempstead and living in Houston, Kimberly conceded that "this is not a for sure thing."  RR 9:55.

Kimberly admitted that she had "not yet" looked into daycares for Jennifer, and didn't know how much they would cost.  RR 9:53, 56.

The Department's plan with termination of parental rights is to allow Theresa and Bob to adopt Jennifer.  RR 9:73.  Jennifer has been placed with Theresa and Bob for more than a year.  RR 8:1, 115-16.  They have already set up day care.  RR 9:133.  Theresa and Bob have worked out a division of labor between the two of them, and have adjusted to life with a baby, want to adopt Jennifer, and love her.  RR 9:133, 166, 169.

The jury could have (1) declined to absolve Kimberly of her history of poor choices in using drugs prior to and throughout the pendency of the case; (2) disbelieved her claim that she had learned her lesson and planned to start a job; and, (3) found the Department's plan of termination and adoption, rather than Kimberly's unrealistic, weak and ill-defined plans, better served the child's interest, supporting

it finding that termination is in the child's best interest. *S.P.M.,* 2014 Tex. App. LEXIS 614 at \*24; *D.O.*, 851 S.W.2d at 356.

This factor strongly supports the best interest finding.

### The Stability of the Home or Proposed Placement

Stability and permanence are paramount in the upbringing of children. *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied). "Without stability, income, or a home, appellant is unable to provide for the child's emotional and physical needs." *C.A.J.,* 122 S.W.3d at 894. A parent's failure to show that she is stable enough to parent a child for any prolonged period entitles the factfinder "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption." *In re B.S.W.*, 2004 Tex. App. LEXIS 11695 at \*26, 2004 WL 2964015, at \*9.

Kimberly could not provide stability for herself before Jennifer's birth up through the completion of the Department's investigation. Kimberly testified that she decided to leave the home when she was seventeen. RR 8:151-52. Kimberly claimed she did not run away because her mother knew where she was. RR 8:151-52. Theresa testified that Kimberly ran away and testified that she was not always able to find Kimberly or maintain contact. RR 9:121. Kimberly testified that she then moved in with a friend "L.M." who used to run a bible study. RR 8:152. She moved out "[n]ot long" after moving in because their boyfriends did not get along.

RR 8:152.  Kimberly claimed she does not remember where she lived after that.  RR 8:152.  At some point she reached an agreement with Theresa to move back home.  RR 8:153.  She testified that she thought her parents were too controlling, so she moved out.  RR 9:153.

She then moved in with her boyfriend "N.N." in Brenham for a few months.  RR 8:154.  She left him when "he was getting on [her] nerves" and moved in with her friend "E.B." in Brenham.  RR 8:155.  Kimberly testified that she stayed with E.B. for almost six months before she moved in with her boyfriend "C.L.", first in Brenham for four months before moving to College Station.  RR 8:155.  They were there two or three months before they moved back to Brenham.  RR 8:156.  Kimberly testified that after her breakup with C.L. her parents helped her obtain a house and a car.  Kimberly's roommate made her leave four months later because Kimberly squandered their money on drugs.  RR 9:11.  Kimberly then testified that she moved in with K.T. and stayed there almost a year.  RR 8:157.  Kimberly testified that she next moved in with her friend T.B.  RR 8:157.

Theresa testified that she lost contact again with her daughter once Kimberly started dating David.  RR 9:126.  Kimberly testified that she was living in Kingswood with her cousin and his wife when Kimberly became pregnant.  RR 8:159.  She had only been in Kingswood a month when she came back to Brenham for the weekend and David was arrested.  RR 8:160.  As a result of the arrest, "I wound up

45

staying in Brenham," Kimberly explained. RR 8:160. She was living with David's mother at that time for a period of about three months. RR 8:160. Kimberly testified that she then moved in with her girlfriend "Natalie" for two months before completing the last three months of her pregnancy at Theresa's home. RR 8:160.

When Jennifer was six weeks old, Kimberly and Jennifer started moving around. RR 8:162. Kimberly vacillated between Theresa's home and David's residence, at the home of his uncle. RR 8:163. As Kimberly explained, "Having a baby and trying to live out of a suitcase is not fun." RR 8:163. Kimberly testified she was staying at an unnamed friend's house with David when the Department initially contacted her. RR 8:161.

Kimberly also couldn't demonstrate stability after the Department was appointed the temporary managing conservator of Jennifer. Ms. Gonzales testified that Kimberly had a "chronic problem" keeping her informed about her living arrangements. RR 9:65. Kimberly indicated that the day after the completion of the first drug rehabilitation program she moved in with her grandmother in Beaumont, but tried to get subsidized housing in Brenham. RR 8:171. Before the Brenham housing application came through, Kimberly decided to move in with David at a Hotel in Hempstead until the end of February 2014. RR 8:173, 177.

Ms. Gonzales testified that in the middle of March 2014, there was an allegation that Kimberly was living with a friend in the Brenham Housing Authority

subdivision. RR 9:75. However, Kimberly and David had moved to a new hotel by March 2014. RR 8:178. Kimberly claimed that she moved in with a friend named "J.M." (no relation) because she wanted to get away from David. RR 8:180. That lasted for about a month. RR 8:182. Thereafter, Kimberly and David stayed at a house with "a friend" before moving into yet another hotel in Waller. RR 8:182-83. After David was arrested in May 2014, Kimberly testified that she lived in "Bluebonnet Hills" with a friend she called "Clayton". RR 7:183, 8:136. Kimberly testified that at the time of trial she was residing with her uncle in Hempstead. RR 8:185-86.

Kimberly claimed at trial that she planned to live with her uncle in Homestead and "try to get my feet underneath me" or move into an aunt's home in Houston. RR 8:196, 9:55.

Kimberly admitted that she only worked during the pendency of the case while she was enrolled at the first drug treatment program. RR 8:194. She claimed she had a job lined up with Brookshire Brothers in Hempstead, but was not going to start it until after the trial. RR 8:196, 9:26.

In contrast, Theresa testified that she and her husband had been living in the same home for sixteen years. RR 9:138, 148. Jennifer had been placed in their home for more than a year at the time of trial. RR 8:1, 115-16. They love her. RR

9:133. Theresa promised the jury that if they were able to adopt, "[w]e're going to continue to do what we've been doing." RR 9:133.

The jury could have considered the evidence of (1) Kimberly's history of instability spanning her entire adult life; (2) her lack of income outside her boyfriend's drug dealing; and, (3) the stability and good care provided by the child's placement, and determined that Kimberly is "unable to provide for the child's emotional and physical needs" and developed a firm conviction or belief that Kimberly's "pattern would likely continue and that permanency could only be achieved through termination and adoption," supporting the finding that termination was in the best interest of the child. *C.A.J.,* 122 S.W.3d at 894; *B.S.W.*, 2004 Tex. App. LEXIS 11695 at \*26.

This factor supports the best interest determination.

### *Acts or Omissions of the Parent Which May Indicate that the Existing Parent-Child Relationship Is Not a Proper One*

Kimberly has a five-year history with methamphetamine. She used drugs during the pendency of this case despite knowing that her parental rights were in jeopardy. During the pendency of this case, she admitted herself to two drug treatment programs, completing the last one only 47 days prior to trial, but failed to enroll in an aftercare program both times. She has not availed herself of individual counseling to address the domestic violence issues, and even though David held a

48

gun to her head during the pendency of this case, from May until the trial in September, she saw David in jail more often than she saw Jennifer.

This factor strongly supports the jury's best interest determination.

***Excuses for the Parent's Acts or Omissions***

Kimberly does not present any excuses for her acts or omissions which would mitigate against the acts or omissions which would indicate that the parent-child relationship is not a proper one. KIMBERLY'S BRIEF, *passim*. This factor supports the jury's best interest determination.

### C. Conclusion

Based on the foregoing, the evidence allowed the jury to reasonably form a firm belief or conviction that termination of Kimberly's parental rights to Jennifer is in the child's best interest. Accordingly, Kimberly's challenge to the jury's best interest determination should be overruled.

**II.** **RESPONSE TO KIMBERLY'S ISSUE ONE:** After a removal hearing before which the Department did not have custody of the child, the trial court, without the benefit of an affidavit of indigence, appointed an attorney once Kimberly appeared in opposition to the suit. Did the trial court err in not appointing an attorney for Kimberly until 7 months prior to trial?

In her first issue, Kimberly claims that the trial court erred in failing to admonish her at the initial hearing about her right to court appointed counsel and in failing to appoint her counsel prior to the February 18, 2014 hearing. KIMBERLY'S

BRIEF 14-16. This issue should be overruled because the trial court appointed Kimberly an attorney once she appeared in opposition to the suit. Additionally, the trial court was under no duty to admonish at a removal hearing before which the Department did not have custody of the child.

## A. Kimberly Appointed Counsel at Appropriate Time

The trial court appointed an attorney for Kimberly at the first appropriate opportunity. The Texas legislature has afforded indigent parents in state-initiated termination proceedings the right to counsel. *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) (citing TEX. FAM. CODE §§ 107.013, 262.201; *In re B.G.*, 317 S.W.3d 250, 253-54 (Tex. 2010)). In cases like this one, a trial court shall appoint an attorney to represent an indigent parent who responds in opposition to the termination or appointment of the Department as conservator of the child. TEX. FAM. CODE § 107.013(a)(1) (Lexis 2014). A parent's filing of an affidavit of indigency is "the act which would trigger the process for mandatory appointment of an attorney ad litem . . . ." *In re K.L.L.H.*, No. 06-09-00067-CV, 2010 Tex. App. LEXIS 154 at *14, 2010 WL 87043, at *5 (Tex. App.—Texarkana Jan. 12, 2010, pet. denied) (mem. op.). This Honorable Court recently addressed the timing of the appointment of counsel:

> Considering the mandatory nature of the appointment of counsel upon a finding of indigency, and the appointed attorney's specific obligations in connection with representing an indigent parent, a trial court should address a parent's affidavit of indigence as soon as possible—before the next critical

50

stage of the proceedings, whether it be a hearing, a mediation, a pretrial conference, or, in particular, a trial on the merits, and allow a reasonable time for appointed counsel to make necessary preparations.

*V.L.B.*, 445 S.W.3d 802, No. 01-14-00201-CV, 2014 Tex. App. LEXIS 10043, *12-*13 (Tex. App.–Houston [1st Dist.] September 4, 2014, no pet.) (op. on reh'g).

In *V.L.B.*, the mother filed her affidavit of indigence a week before the trial setting, which was two months before the dismissal date. *V.L.B.*, 2014 Tex. App. LEXIS 10043 at *13. The trial court in that case appointed counsel after commencement of trial. *V.L.B.*, 2014 Tex. App. LEXIS 10043 at *6. This Court held that this was reversible error because the commencement of trial "was a critical stage of the termination proceedings". *V.L.B.*, 2014 Tex. App. LEXIS 10043 at *13.

In this case, Kimberly did not appear in opposition at the adversary hearing. Under examination by the Department's counsel on September 26, 2013, Kimberly agreed to the placement of her child with her mother and stepfather, and agreed to the Department's involvement. RR 2:9-10. In examination by the attorney ad litem for the child, Kimberly acknowledged that she had a right to contest that hearing, but choose not to because this was in Jennifer's best interest. RR 2:10. At the status hearing on October 14, 2013, Ms. Gonzales testified that Kimberly requested court-appointed counsel. RR 3:10. In response, the trial court indicated there was no application for counsel on file, but asked that the Department give the mother the appropriate paperwork. RR 3:10. At the permanency hearing on February 11,

2014, a representative of the Department testified that both parents expressed a desire for an attorney. RR 4:9. Kimberly was present at that hearing. RR 4:2. The record is devoid of any affidavits of indigence executed by Kimberly until after the trial on the merits. *See* CR 1:183. Nevertheless, the trial court orally appointed her an attorney at the February 2014 permanency hearing, which was followed up by a written order only a week later. RR 4:21, 26; CR 1:105. Kimberly's counsel participated at the next hearing, which was called a "status hearing", on May 6, 2014. RR 5:1, *et seq*. Trial did not begin until September 8, 2014, nearly seven months after the appointment of counsel. RR 8:1.

Because the act that would "trigger" the mandatory appointment of counsel did not occur until after trial, the trial court appointed counsel at the first hearing during which Kimberly appeared in opposition to the Department, the appointment was made before the next critical stage in the case, and the trial court allowed the court-appointed counsel nearly seven months to prepare for trial, the trial court did not commit any reversible error by appointing counsel when it did. TEX. FAM. CODE § 107.013(a)(1); *In re K.L.L.H.*, 2010 Tex. App. LEXIS 154 at *14; *V.L.B.*, 2014 Tex. App. LEXIS 10043 at *12-*13.

## B.    TEX. FAM. CODE § 262.201

Kimberly's reliance on TEX. FAM. CODE § 262.201 in arguing that the trial court had a duty to admonish is misplaced. See KIMBERLY'S BRIEF 13-

16. Kimberly relies on the following provision in arguing that the trial court had a duty to inform her of the right to court-appointed counsel:

(a) Unless the child has already been returned to the parent, managing conservator, possessory conservator, guardian, caretaker, or custodian entitled to possession and the temporary order, if any, has been dissolved, a full adversary hearing shall be held not later than the 14th day after the date the child was taken into possession by the governmental entity, unless the court grants an extension under Subsection (a–3).

(a–1) Before commencement of the full adversary hearing, the court must inform each parent not represented by an attorney of:

(1) the right to be represented by an attorney; and

(2) if a parent is indigent and appears in opposition to the suit, the right to a court-appointed attorney.

(a–2) If a parent claims indigence and requests the appointment of an attorney before the full adversary hearing, the court shall require the parent to complete and file with the court an affidavit of indigence. The court may hear evidence to determine whether the parent is indigent. If the court determines the parent is indigent, the court shall appoint an attorney to represent the parent.

(a–3) The court may, for good cause shown, postpone the full adversary hearing for not more than seven days from the date of the attorney's appointment to provide the attorney time to respond to the petition and prepare for the hearing. The court may shorten or lengthen the extension granted under this subsection if the parent and the appointed attorney agree in writing. If the court postpones the full adversary hearing, the court shall extend a temporary restraining order issued by the court for the protection of the child until the date of the rescheduled full adversary hearing.

(b) At the conclusion of the full adversary hearing, the court shall order the return of the child to the parent, managing conservator, possessory conservator, guardian, caretaker, or custodian entitled to pos-

session unless the court finds sufficient evidence to satisfy a person of ordinary prudence and caution that:

> (1) there was a danger to the physical health or safety of the child which was caused by an act or failure to act of the person entitled to possession and for the child to remain in the home is contrary to the welfare of the child;

> (2) the urgent need for protection required the immediate removal of the child and reasonable efforts, consistent with the circumstances and providing for the safety of the child, were made to eliminate or prevent the child's removal; and

> (3) reasonable efforts have been made to enable the child to return home, but there is a substantial risk of a continuing danger if the child is returned home.

TEX. FAM. CODE § 262.201 (Lexis 2014); APPENDIX 4. A "full adversary hearing" as described here is supposed to occur "[u]nless the child has already been returned to the parent". TEX. FAM. CODE § 262.201(a). In fact the trial court is obligated to "order the return of the child to the parent" unless certain findings are made. TEX. FAM. CODE § 262.201(b). This code provision applies to instances in which the Department took possession of the child without a hearing.

## C.    TEX. FAM. CODE § 262.205

That type of hearing can be compared to a hearing in which the Department did not have prior custody of the child.

**Hearing When Child Not in Possession of Governmental Entity**

(a) In a suit requesting possession of a child after notice and hearing, the court may render a temporary restraining order as provided by Section 105.001. The suit shall be promptly set for hearing.

(b) After the hearing, the court may grant the request to remove the child from the parent . . . if the court finds sufficient evidence to satisfy a person of ordinary prudence and caution that:

(1) reasonable efforts have been made to prevent or eliminate the need to remove the child from the child's home; and

(2) allowing the child to remain in the home would be contrary to the child's welfare.

TEX. FAM. CODE § 262.205 (Lexis 2014); APPENDIX 5. The right to admonishments regarding court-appointed counsel that are mandated in section 262.201 are not present in section 262.205. *Compare* TEX. FAM. CODE § 262.201 *to* § 262.205.

This case is governed by section 262.205, rather than section 262.201, because the Department filed "a suit requesting possession of a child"; it did not take possession of Jennifer without a hearing. TEX. FAM. CODE § 262.205. Ms. Jarvis testified that she asked Kimberly to place Jennifer out of the home on August 21, 2013, based on a positive drug test. RR 8:115. In response, Kimberly asked if she could be the one to leave her parents' home and let Jennifer stay with Theresa and Bob. RR 8:16. Ms. Jarvis testified that at a meeting between the family and the Department, Theresa and her husband indicated that it would preferable for the Department to file for temporary custody in order to monitor the parents' progress. RR 8:118. In its original petition, filed September 12, 2013, the Department requested that the case be set for temporary hearing and that it be appointed the temporary managing conservator after that hearing. CR 1:2, 4. The Department spe-

cifically requested a hearing under § 262.205 of the Texas Family Code. CR 1:5. The trial court set a hearing expressly "to determine whether the Department's request for temporary orders in this case should be granted." CR 1:14. The order rendered as a result of that hearing was expressly made pursuant to TEX. FAM. CODE § 262.205. CR 1:18. The findings the Court made were pursuant to the lower standard in section 262.205(b), not the higher standard of in section 262.201(b). CR 1:17. The hearing in this case occurred before the Department had possession of the child, and was held pursuant to TEX. FAM. CODE § 262.205. Therefore, the admonition from § 262.201(a-1) was inapplicable to this case[5].

Kimberly has failed to show the trial court created reversible error by appointing her an attorney without the required affidavit of indigence almost seven months prior to trial. She was not entitled to any statutorily mandated admonitions. Therefore, her first issue should be overruled.

## PRAYER

For the reasons set out in this brief, the Department respectfully requests that this Honorable Court affirm the judgment of the trial court terminating Kimberly's parental rights to Jennifer.

---

[5] Kimberly also complains that she did not receive the admonition from TEX. FAM. CODE § 262.102(d). KIMBERLY'S BRIEF 13. However, that admonition pertained to temporary orders or attachments obtained without prior notice or hearing. TEX. FAM. CODE § 262.102 (Lexis 2014). There was no such order or attachment in this case. CR 1:*passim*. Therefore, this code provision is also inapplicable.

Respectfully submitted,

/s/ Mark T. Zuniga
Mark T. Zuniga, Appellate Attorney
Office of General Counsel
Texas Department of Family and Protective
Services
2401 Ridgepoint Drive, Bldg. H-2
MC: Y-956
Austin TX 78754
Tel.: (512) 929-6617
Fax: (512) 339-5876
Mark.Zuniga@dfps.state.tx.us
State Bar No. 24013804
Attorney for Appellee

### CERTIFICATE OF COMPLIANCE OF TYPEFACE AND WORD COUNT

In accordance with Texas Rules of Appellate Procedure 9.4 (e) and (i), the undersigned attorney of record certifies that the *Brief of Appellee* contains **14-point** typeface for the body of the brief, **12-point** typeface for footnotes in the brief, and contains **13,712** words, excluding those words identified as not being counted in appellate rule of procedure 9.4(i)(1) and was prepared on Microsoft Word 2010®.

/s/ Mark T. Zuniga
Mark T. Zuniga, Appellate Attorney

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the BRIEF OF APPELLEE was served on each individual below on December 30, 2014 by electronic mail.

Mary Hennessy
Attorney for Appellant K.M.
P.O. Box 2536
Brenham, TX 77834
Mhennessy.attorney@gmail.com

Susan Deski
Attorney *ad litem* for the child
P.O. Box 1798
Brenham, Texas 77834
sdeski@hotmail.com

/s/ Mark T. Zuniga
Mark T. Zuniga, Appellate Attorney

xc:  Renee Ann Mueller
100 East Main, Ste 200
Brenham, TX 77833
rmueller@wacounty.com

# APPENDICES

# APPENDIX 1

## CAUSE NO. 7443

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN COUNTY COURT |
| | § | |
| J.ennifer | § | AT LAW |
| | § | |
| A CHILD | § | WASHINGTON COUNTY, TEXAS |

## ORDER OF TERMINATION

On September 8, 2014 through September 10, 2014, the Court heard this case.

1. **Appearances**

   1.1. The Department of Family and Protective Services ("the Department") appeared through **SAMANTHA GONZALES**, caseworker, and by attorney, **RENEE MUELLER** and announced ready.

   1.2. Respondent Mother Kimberly
   - ☐ appeared in person and announced ready.
   - ☐ appeared through attorney of record Michael Casaretto and announced ready.
   - ☑ appeared in person and through attorney of record Michael Casaretto and announced ready.
   - ☐ waived issuance and service of citation by waiver duly filed.
   - ☐ agreed to the terms of this order as evidenced by signature below.
   - ☐ although duly and properly notified, did not appear and wholly made default.
   - ☐ was not notified, and did not appear.

   1.3. Respondent Presumed Father David
   - ☐ appeared in person and announced ready.
   - ☐ appeared through attorney of record Josh Clover and announced ready.
   - ☐ appeared in person and through attorney of record Josh Clover and announced ready.
   - ☐ waived issuance and service of citation by waiver duly filed.
   - ☑ agreed to the terms of this order as evidenced by signature below.
   - ☐ although duly and properly notified, did not appear and wholly made default.
   - ☐ was not notified, and did not appear.

   1.4. **SUSAN DESKI**, appointed by the Court as Attorney Ad Litem for the child the subject of this suit,
   - ☑ appeared and announced ready.
   - ☐ agreed to the terms of this order as evidenced by signature below.
   - ☐ although duly and properly notified, did not appear and wholly made default.

**FILED**
AT 3:45 O'CLOCK P M

OCT 02 2014
**TAMMY BRAUNER**
District Clerk, Washington County
By _____ Deputy

186

7443
ASAP 2013

1.5. **CASA FOR KIDS**, appointed by the Court as Guardian Ad Litem for the child the subject of this suit,

☑ appeared and announced ready.

☐ agreed to the terms of this order as evidenced by signature below.

☐ although duly and properly notified, did not appear and wholly made default.

## 2. Jurisdiction and Service of Process

2.1. The Court, having examined the record and heard the evidence and argument of counsel, finds the following:

2.1.1. a request for identification of a court of continuing, exclusive jurisdiction has been made as required by Section 155.101, Texas Family Code.

2.1.2. this Court has jurisdiction of this case and of all the parties and that no other court has continuing, exclusive jurisdiction of this case.

2.2. The Court, having examined the record and heard the evidence and argument of counsel, finds that the State of Texas has jurisdiction to render final orders regarding the child the subject of this suit pursuant to Subchapter C, Chapter 152, Texas Family Code, by virtue of the fact that Texas is the home state of the child.

2.3. The Court finds that all persons entitled to citation were properly cited.

## 3. Jury

A jury was duly selected. The Court submitted this case to the jury on questions, and the jury returned its findings on those questions. The jury's findings were received by the Court and filed of record. The questions submitted to the jury and the findings on those questions are approved by the Court and incorporated in this order.

## 4. Record

The record of testimony was duly reported by the court reporter for the County Court at Law of Washington County.

## 5. The Child

The Court finds that the following child is the subject of this suit:

Name: Jennifer
Sex:
Birth Date:
Present Residence: **relative's home**
Driver's License Number: **n/a**

6. **Termination of Respondent Mother K**imberly **'S Parental Rights**

    6.1.    The Court finds by clear and convincing evidence that termination of the parent-child relationship between **K**imberly . and the child the subject of this suit is in the child's best interest.

    6.2.    Further, the Court finds by clear and convincing evidence that **K**imberly has:

        6.2.1.  knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, pursuant to § 161.001(1)(D), Texas Family Code;

        6.2.2.  engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, pursuant to § 161.001(1)(E), Texas Family Code;

        6.2.3.  failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child, pursuant to § 161.001(1)(O), Texas Family Code;

        6.2.4.  used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance, pursuant to § 161.001(1)(P), Texas Family Code;

    6.3.    **IT IS THEREFORE ORDERED** that the parent-child relationship between **K**imberly and the child the subject of this suit is terminated.

7. **Termination of Respondent Father D**avid **'S Parental Rights**

    7.1.    The Court finds by clear and convincing evidence that termination of the parent-child relationship between **D**avid and the child Jennifer , is in the child's best interest.

    7.2.    Further, the Court finds by clear and convincing evidence that **D**avid has:

        7.2.1.  executed before or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by Chapter 161, Texas Family Code, pursuant to § 161.001(1)(K), Texas Family Code;

7.3. **IT IS THEREFORE ORDERED** that the parent-child relationship between D'avid _____ and the child Jennifer _____ is terminated.

## 8. Interstate Compact

The Court finds that Petitioner has filed a verified allegation or statement regarding compliance with the Interstate Compact on the Placement of Children as required by § 162.002(b)(1) of the Texas Family Code.

## 9. Managing Conservatorship: Jennifer

9.1. The Court finds that the appointment of the Respondents as permanent managing conservator of the child is not in the child's best interest because the appointment would significantly impair child's physical health or emotional development.

9.2. **IT IS ORDERED** that the **DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES** is appointed Permanent Managing Conservator of Jennifer _____ a child the subject of this suit, with the rights and duties specified in § 153.371, Texas Family Code; the Court finding this appointment to be in the best interest of the child.

9.2.1. In addition to these rights and duties, **IT IS ORDERED** that the Department is authorized to consent to the medical care for J. _____ under § 266.004, Texas Family Code.

## 10. Required Information Regarding the Parties and Child

10.1. The child's information is provided above; the information required of each party not exempted from such disclosure is:

10.1.1.       Name: Kimberly
      Driver's License: _____
      Current address: _____
      Home telephone number: _____
      Name of employer: _____
      Address of employment: _____
      Work telephone number: _____

10.1.2.       Name: D'avid
      Driver's License: _____
      Current address: _____
      Home telephone number: _____
      Name of employer: _____
      Address of employment: _____
      Work telephone number: _____

10.2. **IT IS ORDERED** that each parent, who has not previously done so, provide information regarding the medical history of the parent and parent's ancestors on the medical history report form, pursuant to § 161.2021, Texas Family Code.

## 11. Continuation of Court-Ordered Ad Litem or Advocate

11.1. The Court finds that the child the subject of this suit will continue in care and this Court will continue to review the placement, progress and welfare of the child.

11.2. **IT IS THEREFORE ORDERED** that **SUSAN DESKI**, earlier appointed as Attorney Ad Litem to represent the best interest of the child, is continued in this relationship until further order of this Court or final disposition of this suit.

11.3. **IT IS THEREFORE ORDERED** that **CASA FOR KIDS**, earlier appointed as Guardian Ad Litem to represent the best interest of the child, is continued in this relationship until further order of this Court or final disposition of this suit.

## 12. Court Ordered Ad Litem for Parent

12.1. **IT IS THEREFORE ORDERED** that **MICHAEL CASARETTO** earlier appointed to represent **K**imberly is relieved of all duties based on a finding of good cause.

12.2. **IT IS THEREFORE ORDERED** that **JOSH CLOVER** earlier appointed to represent **D**avid is relieved of all duties based on a finding of good cause.

## 13. Dismissal of Other Court-Ordered Relationships

Except as otherwise provided in this order, any other existing court-ordered relationships with the child the subject of this suit are hereby terminated and any parties claiming a court-ordered relationship with the child are dismissed from this suit.

## 14. Child Support

Pursuant to § 154.001, Texas Family Code, **IT IS ORDERED** that the parents shall pay child support for the child as set forth in Attachment A to this Order, which is incorporated herein as if set out verbatim in this paragraph.

## 15. Inheritance Rights

This Order shall not affect the right of any child to inherit from and through any party.

## 16. Denial of Other Relief

**IT IS ORDERED** that all relief requested in this case and not expressly granted is denied.

17.  **WARNING: APPEAL OF FINAL ORDER, PURSUANT TO § 263.405, TFC**

A PARTY AFFECTED BY THIS ORDER HAS THE RIGHT TO APPEAL.  AN APPEAL IN A SUIT IN WHICH TERMINATION OF THE PARENT-CHILD RELATIONSHIP IS SOUGHT IS GOVERNED BY THE PROCEDURES FOR ACCELERATED APPEALS IN CIVIL CASES UNDER THE TEXAS RULES OF APPELLATE PROCEDURE.  FAILURE TO FOLLOW THE TEXAS RULES OF APPELLATE PROCEDURE FOR ACCELERATED APPEALS MAY RESULT IN THE DISMISSAL OF THE APPEAL.

18.  **NOTICE TO ANY PEACE OFFICER OF THE STATE OF TEXAS:**

YOU MAY USE REASONABLE EFFORTS TO ENFORCE THE TERMS OF CHILD CUSTODY SPECIFIED IN THIS ORDER.  A PEACE OFFICER WHO RELIES ON THE TERMS OF A COURT ORDER AND THE OFFICER'S AGENCY ARE ENTITLED TO THE APPLICABLE IMMUNITY AGAINST ANY CLAIM, CIVIL OR OTHERWISE, REGARDING THE OFFICER'S GOOD FAITH ACTS PERFORMED IN THE SCOPE OF THE OFFICER'S DUTIES IN ENFORCING THE TERMS OF THE ORDER THAT RELATE TO CHILD CUSTODY.    ANY  PERSON  WHO  KNOWINGLY  PRESENTS  FOR ENFORCEMENT AN ORDER THAT IS INVALID OR NO LONGER IN EFFECT COMMITS AN OFFENSE THAT MAY BE PUNISHABLE BY CONFINEMENT IN JAIL FOR AS LONG AS TWO YEARS AND A FINE OF AS MUCH AS $10,000.

SIGNED this _____ day of _____, 2014.


_____
JUDGE PRESIDING


**APPROVED AS TO FORM:**

_____
Renée Mueller
Attorney for Petitioner, Department of Family and Protective Services
100 E. Main, Ste. 200
Brenham, TX 77833
*phone:* (979) 277-6200
*fax:* (979) 277-6215
State Bar # 14624950

_Susan Deski_

Susan Deski
Attorney Ad Litem for the Child
P.O. Box 1798
Brenham, TX 77834
State Bar #
_phone:_ (979) 830-1530
_fax:_ (979) 830-1533

CASA for Kids
Guardian Ad Litem for the Child
2309 S. Day St.
Brenham, TX 77833
_phone:_ (979) 277-0088
_fax:_ (979) 277-0092

Michael Casaretto
Attorney for the Mother, Kimberly
114 W. Alamo St., Ste. 26
Brenham, TX 77833
State Bar #
_phone:_ (979) 836-2070
_fax:_ (832) 431-3703

Josh Clover  → as to Form Only.
Attorney for the Presumed Father, David
P.O. Box 2548
Brenham, TX 77834
State Bar #
_phone:_ (979) 836-7733
_fax:_

Attachment A

1.  **Child Support Obligation: K**imberly

1.1.  The Court finds that **K**imberly has the ability to pay and is obligated to support J**ennifer ., a child the subject of this suit, pursuant to §154.001(a) (1), Texas Family Code.

1.2.  **Monthly Payments**

1.2.1.  **IT IS ORDERED** that **K**imberly is obligated to pay and shall pay child support to the Department of $225.00 per month for the support of **J**ennifer, and **IT IS ORDERED** that **K**imberly is obligated to pay and shall pay medical support to the Department of $100.00 per month for the medical support of **J**ennifer, with the first payments being due and payable on October 1, 2014 and a like payments being due and payable on the 1st day of each month thereafter until the first month following the date of the earliest occurrence of one of the events specified below:

1.2.1.1.  **J**ennifer, child reaches the age of eighteen years, provided that, if the child is fully enrolled in an accredited secondary school in a program leading toward a high school diploma, the periodic child support payments shall continue to be due and paid until the end of the month in which the child graduates;

1.2.1.2.  **J**ennifer ., child marries;

1.2.1.3.  **J**ennifer, child dies;

1.2.1.4.  **J**ennifer, child's disabilities are otherwise removed for general purposes;

1.2.1.5.  further order modifying this child support;

1.2.1.6.  the date on which the child begins active service in the armed forces, as defined by 10 U.S.C., Section 101; or

1.2.1.7  **J**ennifer, child is adopted.

1.3.  **Withholding from Earnings for Child Support**

1.3.1.  **IT IS ORDERED** that income shall be withheld from the disposable earnings of **K**imberly under this order for payment of child support.

1.3.2. **IT IS FURTHER ORDERED** that all amounts withheld from the disposable earnings of K̲ᵢₘₐₐₐₗᵧ by the employer and paid in accordance with the order by that employer shall constitute a credit against the child support obligation. Payment of the full amount of child support ordered paid by this order through the means of withholding from earnings shall discharge the child support obligation. If the amount withheld from earnings and credited against the child support obligation is less than 100 percent of the amount ordered to be paid by this order, the balance due remains an obligation of **K** ₐₘₐₐₐₗᵧ and it is hereby **ORDERED** that **K** ₐₘₐₐₐₗᵧ pay the balance due directly to the registry specified above.

1.3.3. On this date the Court signed an "Employer's Order to Withhold from Earnings for Child Support" with respect to each obligor under this order.

1.3.4. **IT IS ORDERED** that an employer K ₐₘₐₐₐₗᵧ , current and subsequent, withhold income from the disposable earnings of **K** ₐₘₐₐₐₗᵧ under the "Employer's Order to Withhold from Earnings for Child Support".

1.3.5. **IT IS ORDERED** that, on the request of the Department, a prosecuting attorney, the Title IV-D Agency, or the parent obligated to pay support, the clerk of this Court shall cause a certified copy of the appropriate "Employer's Order to Withhold from Earnings for Child Support" to be delivered to the employer of any obligor. **IT IS FURTHER ORDERED** that the clerk of this Court shall attach a copy of subchapter C of chapter 158 of the Texas Family Code for the information of any employer.

1.3.6. **IT IS ORDERED** that K ₐₘₐₐₐₗᵧ ", provide any subsequent employer a copy of the "Employer's Order to Withhold from Earnings for Child Support".

2. **Child Support Obligation:** Dₐₐᵤᵢ d

2.1. Pursuant to Section 154.001(a)(1), Texas Family Code, the Court finds that Respondent Father Dₐₐᵤᵢ d is not obligated to support Jₑₙₙᵢfₑᵣ , a child the subject of this suit, due to incarnation and inability to pay at this time.

3. **Place and Manner of Payment**

**IT IS FURTHER ORDERED** that all child support payments are to be made through the Office of the Attorney General, Texas Child Support State Distribution Unit, P.O. Box 659791, San Antonio, Texas 78265-9791 and then remitted by that agency to the Department of Family and Protective Services for the support of the child.

## 4. Order to Employer Entered

4.1. On this date an "Employer's Order to Withhold from Earnings for Child Support" was entered by the Court. However, each parent obligated and ordered to support a child, subject of this suit, is responsible for and is **ORDERED** to make payment of all child support until an employer complies with the "Employer's Order," or if an employer fails to comply with that order at any time.

4.2. The Court **ORDERS** the Clerk of the Court, upon request, to cause a certified copy of the Employer's Order to Withhold Earnings for Child Support, with a copy of Chapter 158, Texas Family Code attached, to be delivered to the Respondents' employer(s) whether current or subsequent. The Court **ORDERS** the Respondents to provide any subsequent employer(s) with a copy of the Employer's Order to Withhold Earnings for Child Support filed herein.

SIGNED this __2__ day of __October__, 2014.

_____
JUDGE PRESIDING

**APPROVED AS TO FORM:**

_____
Renee Mueller
Attorney for Petitioner, Department of Family and Protective Services
100 E. Main, Ste. 200
Brenham, TX 77833
*phone:* (979) 277-6200
*fax:* (979) 277-6215
State Bar # 14624950

_____
Susan Deski
Attorney Ad Litem for the Child
P.O. Box 1798
Brenham, TX 77834
State Bar #
*phone:* (979) 830-1530
*fax:* (979) 830-1533

# APPENDIX 2

RECEIVED

OCT 2 2 2014

CAUSE NO. CCL 7443

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN COUNTY COURT |
| | § | |
| | § | |
| | § | AT LAW |
| JENNIFER | § | |
| | § | |
| A CHILD | § | WASHINGTON COUNTY, TEXAS |

## JUDGMENT NUNC PRO TUNC

On the 2nd day of October 2014, this court rendered an Order of Termination in the above styled case and the court signed only the Attachment A which addressed the issue of child support. The court failed to sign the Order of Termination on page six of the Order of Termination.

The Court by this document acknowledges its intent on October 2nd, 2014 was to have signed the Order of Termination on page six. The Court's intention was that the Order of Termination be a final order on October 2, 2014.

The remaining portions of the judgment remain in effect as ordered.

Signed this the 6 day of November, 2014.

Judge Matthew Reue

**FILED**
AT 57 O'CLOCK P M

NOV 06 2014
TAMMY BRAUNER
District Clerk, Washington County
By _____ Deputy

2

# APPENDIX 3



# Tex. Fam. Code § 161.001

This document is current through the 2013 3rd Called Session Federal case annotations: February 18, 2014 postings on Lexis State case annotations: February 19, 2014 postings on Lexis

*Texas Statutes and Codes* > *TEXAS FAMILY CODE* > *TITLE 5. THE PARENT-CHILD RELATIONSHIP AND THE SUIT AFFECTING THE PARENT-CHILD RELATIONSHIP* > *SUBTITLE B. SUITS AFFECTING THE PARENT-CHILD RELATIONSHIP* > *CHAPTER 161. TERMINATION OF THE PARENT-CHILD RELATIONSHIP* > *SUBCHAPTER A. GROUNDS*

---

§ 161.001. Involuntary Termination of Parent-Child Relationship

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:

**(1)** that the parent has:

**(A)** voluntarily left the child alone or in the possession of another not the parent and expressed an intent not to return;

**(B)** voluntarily left the child alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least three months;

**(C)** voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months;

**(D)** knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

**(E)** engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

**(F)** failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition;

**(G)** abandoned the child without identifying the child or furnishing means of identification, and the child's identity cannot be ascertained by the exercise of reasonable diligence;

**(H)** voluntarily, and with knowledge of the pregnancy, abandoned the mother of the child beginning at a time during her pregnancy with the child and continuing through the birth, failed to provide adequate support or medical care for the mother during the period of abandonment before the birth of the child, and remained apart from the child or failed to support the child since the birth;

**(I)** contumaciously refused to submit to a reasonable and lawful order of a court under Subchapter D, Chapter 261;

**(J)** been the major cause of:

**(i)** the failure of the child to be enrolled in school as required by the Education Code; or

**(ii)** the child's absence from the child's home without the consent of the parents or guardian for a substantial length of time or without the intent to return;

**(K)** executed before or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by this chapter;

**(L)** been convicted or has been placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child under the following sections of the Penal Code or adjudicated under Title 3 for conduct that caused the death or serious injury of a child and that would constitute a violation of one of the following

Penal Code sections:

**(i)** Section 19.02 (murder);

**(ii)** Section 19.03 (capital murder);

**(iii)** Section 19.04 (manslaughter);

**(iv)** Section 21.11 (indecency with a child);

**(v)** Section 22.01 (assault);

**(vi)** Section 22.011 (sexual assault);

**(vii)** Section 22.02 (aggravated assault);

**(viii)** Section 22.021 (aggravated sexual assault);

**(ix)** Section 22.04 (injury to a child, elderly individual, or disabled individual);

**(x)** Section 22.041 (abandoning or endangering child);

**(xi)** Section 25.02 (prohibited sexual conduct);

**(xii)** Section 43.25 (sexual performance by a child);

**(xiii)** Section 43.26 (possession or promotion of child pornography);

**(xiv)** Section 21.02 (continuous sexual abuse of young child or children);

**(xv)** Section 20A.02(a)(7) or (8)(trafficking of persons); and

**(xvi)** Section 43.05(a)(2)(compelling prostitution);

**(M)** had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state;

**(N)** constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months, and:

**(i)** the department or authorized agency has made reasonable efforts to return the child to the parent;

**(ii)** the parent has not regularly visited or maintained significant contact with the child; and

**(iii)** the parent has demonstrated an inability to provide the child with a safe environment;

**(O)** failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child;

**(P)** used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and:

**(i)** failed to complete a court-ordered substance abuse treatment program; or

**(ii)** after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance;

**(Q)** knowingly engaged in criminal conduct that has resulted in the parent's:

**(i)** conviction of an offense; and

**(ii)** confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition;

**(R)** been the cause of the child being born addicted to alcohol or a controlled substance, other than a controlled substance legally obtained by prescription, as defined by Section 261.001;

**(S)** voluntarily delivered the child to a designated emergency infant care provider under Section 262.302 without expressing an intent to return for the child; or

**(T)** been convicted of:

**(i)** the murder of the other parent of the child under *Section 19.02 or 19.03, Penal Code*, or under a law of another state, federal law, the law of a foreign country, or the Uniform Code of Military Justice that contains elements that are substantially similar to the elements of an offense under *Section 19.02 or 19.03, Penal Code*;

**(ii)** criminal attempt under *Section 15.01, Penal Code*, or under a law of another state, federal law, the law of a foreign country, or the Uniform Code of Military Justice that contains elements that are substantially similar to the elements of an offense under *Section 15.01, Penal Code*, to commit the offense described by Subparagraph (i); or

**(iii)** criminal solicitation under *Section 15.03, Penal Code*, or under a law of another state, federal law, the law of a foreign country, or the Uniform Code of Military Justice that contains elements that are substantially similar to the elements of an offense under *Section 15.03, Penal Code*, of the offense described by Subparagraph (i); and

**(2)** that termination is in the best interest of the child.

---

**History**

---

Enacted by *Acts 1995, 74th Leg., ch. 20 (H.B. 655)*, § 1, effective April 20, 1995; am. *Acts 1995, 74th Leg., ch. 709 (S.B. 338)*, § 1, effective September 1, 1995; am. *Acts 1995, 74th Leg., ch. 751 (H.B. 433)*, § 65, effective September 1, 1995; am. *Acts 1997, 75th Leg., ch. 575 (H.B. 1826)*, § 9, effective September 1, 1997; am. *Acts 1997, 75th Leg., ch. 1022 (S.B. 359)*, § 60, effective September 1, 1997; am. *Acts 1999, 76th Leg., ch. 1087 (H.B. 3423)*, § 1, effective September 1, 1999; am. *Acts 1999, 76th Leg., ch. 1390 (H.B. 1622)*, § 18, effective September 1, 1999; am. *Acts 2001, 77th Leg., ch. 809 (H.B. 706)*, § 1, effective September 1, 2001; am. *Acts 2005, 79th Leg., ch. 508 (H.B. 657)*, § 2, effective September 1, 2005; am. *Acts 2007, 80th Leg., ch. 593 (H.B. 8)*, § 3.30, effective September 1, 2007; am. *Acts 2009, 81st Leg., ch. 86 (S.B. 1838)*, § 1, effective September 1, 2009; am. *Acts 2011, 82nd Leg., ch. 1 (S.B. 24)*, § 4.02, effective September 1, 2011.

LexisNexis ® Texas Annotated Statutes

Copyright © 2014 by Matthew Bender & Company, Inc. a member of the LexisNexis Group All rights reserved.

# APPENDIX 4

LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

\*\*\* This document is current through the 2013 3rd Called Session \*\*\*

TEXAS FAMILY CODE
TITLE 5.   THE PARENT-CHILD RELATIONSHIP AND THE SUIT AFFECTING THE PARENT-CHILD RELA-
TIONSHIP
SUBTITLE E.   PROTECTION OF THE CHILD
CHAPTER 262.   PROCEDURES IN SUIT BY GOVERNMENTAL ENTITY TO PROTECT HEALTH AND
SAFETY OF CHILD
SUBCHAPTER C.   ADVERSARY HEARING

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Fam. Code § 262.201*   (2014)

§ 262.201.   Full Adversary Hearing; Findings of the Court

   (a) Unless the child has already been returned to the parent, managing conservator, possessory conservator, guardian, caretaker, or custodian entitled to possession and the temporary order, if any, has been dissolved, a full adversary hearing shall be held not later than the 14th day after the date the child was taken into possession by the governmental entity, unless the court grants an extension under Subsection (a-3).

   (a-1) Before commencement of the full adversary hearing, the court must inform each parent not represented by an attorney of:

      (1) the right to be represented by an attorney; and

      (1) if a parent is indigent and appears in opposition to the suit, the right to a court-appointed attorney.

   (a-2) If a parent claims indigence and requests the appointment of an attorney before the full adversary hearing, the court shall require the parent to complete and file with the court an affidavit of indigence. The court may hear evidence to determine whether the parent is indigent. If the court determines the parent is indigent, the court shall appoint an attorney to represent the parent.

   (a-3) The court may, for good cause shown, postpone the full adversary hearing for not more than seven days from the date of the attorney's appointment to provide the attorney time to respond to the petition and prepare for the hearing. The court may shorten or lengthen the extension granted under this subsection if the parent and the appointed attorney agree in writing. If the court postpones the full adversary hearing, the court shall extend a temporary restraining order issued by the court for the protection of the child until the date of the rescheduled full adversary hearing.

   (b) At the conclusion of the full adversary hearing, the court shall order the return of the child to the parent, managing conservator, possessory conservator, guardian, caretaker, or custodian entitled to possession unless the court finds sufficient evidence to satisfy a person of ordinary prudence and caution that:

      (1) there was a danger to the physical health or safety of the child which was caused by an act or failure to act of the person entitled to possession and for the child to remain in the home is contrary to the welfare of the child;

      (2) the urgent need for protection required the immediate removal of the child and reasonable efforts, consistent with the circumstances and providing for the safety of the child, were made to eliminate or prevent the child's removal; and

      (3) reasonable efforts have been made to enable the child to return home, but there is a substantial risk of a continuing danger if the child is returned home.

(c) If the court finds sufficient evidence to satisfy a person of ordinary prudence and caution that there is a continuing danger to the physical health or safety of the child and for the child to remain in the home is contrary to the welfare of the child, the court shall issue an appropriate temporary order under Chapter 105. The court shall require each parent, alleged father, or relative of the child before the court to complete the proposed child placement resources form provided under Section 261.307 and file the form with the court, if the form has not been previously filed with the court, and provide the Department of Family and Protective Services with information necessary to locate any other absent parent, alleged father, or relative of the child. The court shall inform each parent, alleged father, or relative of the child before the court that the person's failure to submit the proposed child placement resources form will not delay any court proceedings relating to the child. The court shall inform each parent in open court that parental and custodial rights and duties may be subject to restriction or to termination unless the parent or parents are willing and able to provide the child with a safe environment. If the court finds that the child requires protection from family violence by a member of the child's family or household, the court shall render a protective order under Title 4 for the child. In this subsection, "family violence" has the meaning assigned by Section 71.004.

(d) In determining whether there is a continuing danger to the physical health or safety of the child, the court may consider whether the household to which the child would be returned includes a person who:

(1) has abused or neglected another child in a manner that caused serious injury to or the death of the other child; or

(2) has sexually abused another child.

(e) The court shall place a child removed from the child's custodial parent with the child's noncustodial parent or with a relative of the child if placement with the noncustodial parent is inappropriate, unless placement with the noncustodial parent or a relative is not in the best interest of the child.

(f) When citation by publication is needed for a parent or alleged or probable father in an action brought under this chapter because the location of the parent, alleged father, or probable father is unknown, the court may render a temporary order without delay at any time after the filing of the action without regard to whether notice of the citation by publication has been published.

(g) For the purpose of determining under Subsection (a) the 14th day after the date the child is taken into possession, a child is considered to have been taken into possession by the department on the expiration of the five-day period permitted under Section 262.007(c) or 262.110(b), as appropriate.

# APPENDIX 5

LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***

TEXAS FAMILY CODE
TITLE 5.   THE PARENT-CHILD RELATIONSHIP AND THE SUIT AFFECTING THE PARENT-CHILD RELA-
TIONSHIP
SUBTITLE E.   PROTECTION OF THE CHILD
CHAPTER 262.   PROCEDURES IN SUIT BY GOVERNMENTAL ENTITY TO PROTECT HEALTH AND
SAFETY OF CHILD
SUBCHAPTER C.   ADVERSARY HEARING

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Fam. Code § 262.205*   (2014)

§ 262.205.   Hearing When Child Not in Possession of Governmental Entity

   (a) In a suit requesting possession of a child after notice and hearing, the court may render a temporary restraining order as provided by Section 105.001. The suit shall be promptly set for hearing.

   (b) After the hearing, the court may grant the request to remove the child from the parent, managing conservator, possessory conservator, guardian, caretaker, or custodian entitled to possession of the child if the court finds sufficient evidence to satisfy a person of ordinary prudence and caution that:

      (1) reasonable efforts have been made to prevent or eliminate the need to remove the child from the child's home; and

      (2) allowing the child to remain in the home would be contrary to the child's welfare.

   (c) If the court orders removal of the child from the child's home, the court shall:

      (1) issue an appropriate temporary order under Chapter 105; and

      (2) inform each parent in open court that parental and custodial rights and duties may be subject to restriction or termination unless the parent is willing and able to provide a safe environment for the child.

   (d) If citation by publication is required for a parent or alleged or probable father in an action under this chapter because the location of the person is unknown, the court may render a temporary order without regard to whether notice of the citation has been published.

   (e) Unless it is not in the best interest of the child, the court shall place a child who has been removed under this section with:

      (1) the child's noncustodial parent; or

      (2) another relative of the child if placement with the noncustodial parent is inappropriate.

   (f) If the court finds that the child requires protection from family violence by a member of the child's family or household, the court shall render a protective order for the child under Title 4.